# WARWICK C. SHERRARD v. EDITH M. HULL

[No. 122, September Term, 1982.]

*Decided February 2, 1983.*

The cause was argued before LISS, ADKINS and ALPERT, JJ.

*Edwin B. Fockler, III* and *C. Thomas Brown* for appellant.

*James D. Peacock* and *Daniel J. Moore,* with whom were *Semmes, Bowen & Semmes* on the brief, for appellee.

ALPERT, J., delivered the opinion of the Court.

This case reaches us from a judgment for the defendant, Edith M. Hull ("Hull") in a defamation action brought by Warwick C. Sherrard ("Sherrard") in the Circuit Court for Cecil County. On appeal, Sherrard offers two assignments of error:

1. The trial court erroneously instructed the jury on the question of privilege; and
2. The trial court erred in denying the plaintiff's motion for a directed verdict.

In a cross appeal, Hull contends that the trial court erred in not finding the existence of an absolute privilege as a matter of law for the alleged defamatory statements.

The facts in this case are relatively simple. It is the application of the law of defamation to those facts that gives rise to the dispute. Edith Hull is a 66 year old woman who has in the past injected herself into a variety of local political disputes over issues including zoning disputes. Warwick Sherrard is a locally prominent businessman and occasional politician in Cecil County. On April 7, 1980 a hearing was held before the Cecil County Board of County Commissioners ("the Board") on Sherrard's application to change the zoning designation of property located near Mrs. Hull's farm. Hull testified in opposition to the proposed change, but one week later, on April 14, 1980, learned that the Board had granted the rezoning application.

The next day, April 15, 1980, Hull appeared at an open meeting of the Board and presented her views on a number of subjects. She began by discussing problems concerning

property adjacent to her property, unrelated to the Sherrard rezoning. The topic then switched to issues raised under the County Code and the amount of mileage compensation the Commissioners were entitled to. Finally, she brought up the issue of the Sherrard rezoning, and in the course of her comments she asked of a County Commissioner who had voted affirmatively for the Sherrard rezoning, "I would like to know how much money it cost Warwick [Sherrard]."

The exchange was recorded in the official minutes of the Board. Sherrard learned of Hull's comments and on May 23, 1980 filed suit against her, alleging defamation. Trial was held beginning on November 10, 1981 (Mackey, J. presiding) and on November 17, 1981 a jury returned a verdict in favor of Hull. This appeal followed and presents us with novel questions regarding absolute privilege in defamation actions based upon statements made at a hearing or meeting of a local legislative body.

Within this limited factual framework, we hold that remarks made by an individual in the course of petitioning for a redress of grievances before a legislative body are absolutely privileged under the First Amendment to the United States Constitution. So long as the individual's comments are not part of a sham and are relevant to his petition and thus are uttered as a part of or in conjunction with it, he may not be held liable in damages for defamation. We further hold that the trial judge was correct in denying both parties' motion for directed verdicts. Accordingly, we shall affirm.

I. *Privilege*

At trial, the appellee relied upon the defense of absolute privilege because of Hull's constitutional right to petition a legislative body for redress of grievances. The common law recognizes absolute defamation privileges with respect to comments made in a judicial or legislative setting. We do not concern ourselves with these privileges, for the petitioning for redress of grievances privilege is an independent and distinct privilege embodied in the First Amendment. To the extent that petitioning for a redress of grievances before a

legislative body may fall under the umbrella of a legislative privilege, we acknowledge the potential overlap. Nevertheless, it is important to note that there does exist a distinction between the two privileges and what might constitute protected speech under one privilege may not necessarily be protected under the other.

## A. *Judicial Privilege*

The Court of Appeals has recognized that an absolute witness privilege exists in this State for defamations made in a judicial setting.[1] The absolute privilege defeats any defamation action resulting from witness testimony in a judicial proceeding. *Korb v. Kowaleviocz,* 285 Md. 699, 402 A.2d 897 (1979). This absolute privilege protects the person publishing the defamatory statement from liability even if his purpose or motive was malicious, he knew that the statement was false, or his conduct was otherwise unreasonable. *Maulsby v. Reifsnider,* 69 Md. 143, 14 A. 505 (1888). In *Korb,* the Court of Appeals reaffirmed Maryland's minority English Rule which makes the privilege unconditional as to witness testimony and rejected the American Rule which would restrict the privilege to instances where the witness' testimony is relevant or pertinent to a proceeding or is given in response to a proper question by counsel or by the court. *Korb, supra,* 285 Md. at 704, 402 A.2d at 899. *See generally,* Prosser, *Law of Torts* §114 (4th ed. 1971); 50 Am.Jur.2d, *Libel and Slander* §231 (1970).

The absolute privilege has been held inapplicable to a "quasi-judicial proceeding," *Schoonfield v. Mayor and City*

---

1. The Court of Appeals, in Adams v. Peck, 288 Md. 1, 5, 415 A.2d 292, 294 (1980), observed that:

> The question whether a defamatory statement should be absolutely privileged involves a matter of public policy in which the public interest in free disclosure must be weighed against the harm to individuals who may be defamed. *See Maurice v. Worden,* 54 Md. 233, 253 (1880). The underlying rationale for according an absolute privilege to defamatory statements made in court by participants in judicial proceedings ... is that such a privilege is necessary to the proper administration of justice.

*Council of Baltimore,* 399 F. Supp. 1068, 1091 (D.Md. 1975), *aff'd without opinion,* 544 F.2d 515 (4th Cir. 1976) (applying Maryland law).

The Court of Appeals, in *Gersh v. Ambrose,* 291 Md. 188, 434 A.2d 547 (1981) addressed for the first time a claim of absolute witness privilege in a forum other than a courtroom. In that case Howard Gersh, an Assistant State's Attorney for Baltimore City, was sued for slanderously accusing Lance Ambrose, a staff member of the Baltimore City Community Relations Commission, of having committed the criminal offenses of obstruction of justice and subornation of perjury. Gersh had made the accusation at a public hearing of the Commission while testifying as a witness. The Court refused to grant an absolute witness immunity to Gersh. It observed that:

> Most American courts which have extended absolute immunity to witnesses testifying in other than strictly judicial, in-court settings have first assured themselves that in such settings there are sufficient judicial safeguards so as to minimize the likelihood of harm to potentially defamed (or otherwise injured) individuals who would have no legal remedy.

291 Md. at 192, 434 A.2d at 549.

The Court of Appeals continued:

> Among the cases which have declined to extend absolute immunity in administrative settings, two types of reasons have emerged. Either the record failed to establish that the involved agency, while possessed of certain judicial or quasi-judicial duties, was engaged in such activities at the time the alleged injury took place, or certain elementary safeguards simply were not present.

*Id.* at 194, 434 A.2d at 550 (footnotes omitted). *See, Tatro v. Esham,* 335 A.2d 623 (Del. Super. 1975). The *Gersh* court found insufficient judicial safeguards which create the

freespeaking atmosphere that witness immunity is designed to provide and which is present in judicial proceedings. It thus refused to extend absolute witness immunity to this particular Commission hearing. Since Hull was petitioning to a legislative body, its reasoning is neither pertinent nor persuasive in the case *sub judice.*

Since it is clear that the Cecil County Board of County Commissioners was not exercising judicial functions, Hull would not enjoy an absolute immunity based on judicial privilege.

## B. *Legislative Privilege*

The courts of this State have also recognized that official participants in legislative proceedings enjoy an absolute immunity from defamation actions; *see, Brush-Moore Newspapers, Inc. v. Pillott,* 220 Md. 132, 151 A.2d 530 (1959); *Walker v. D'Alesandro,* 212 Md. 163, 129 A.2d 148 (1957); *Maurice v. Worden,* 54 Md. 233 (1880). This immunity, like that of judicial immunity, is based upon public policy. In order for a democratic government to govern democratically, it is necessary that an atmosphere be created whereby facts may be freely presented to the governing legislative body. Without such a freespeaking environment, individuals might be discouraged from addressing their government. However, while recognizing the existence of a legislative privilege, no Maryland case has ever squarely addressed the contours of the privilege in a particular factual situation. Because of the view which we take with regard to the "petitioning privilege," we need not decide the question of whether a legislative privilege is applicable in the instant appeal.[2]

---

2. The scope of the legislative privilege for witnesses has been:

> ... generally held to be subject to the same rules or privilege as is similar testimony in courts of justice. If the testimony is material to the inquiry or responsive to a question asked by the tribunal, it is generally held to be absolutely privileged. Thus, the presentation of a petition to members of a legislative committee appointed to hear and examine grievances is within the protection of the rule of privilege, and the protection of absolute privilege has been held to extend to testimony before a legislative

## C. *Petitioning Privilege*

The jury could properly have found the existence of an absolute privilege for Hull based upon the constitutional right to petition for redress of grievances. In this regard, Judge Mackey instructed the jury:

A general rule of law when a person is petitioning a legislature and for our purpose the County Commissioners meeting in regular session as they were in this instance, are considered to be and come under the definition of a legislature. They do pass laws and ordinances for us, and otherwise defined by the law as legislature. That when a person petitions County Commissioners meeting in regular session as they were in this instance, that person who's petitioning County Commissioners is immune from legal liability from defaming anyone. What they say before the County Commissioners is under an absolute privilege. And the reasoning behind this is that the people should be allowed in particular a democracy to freely communicate with

---

committee investigating a proposed bill to outlaw trading stamps that the use of such stamps increases retail prices. The relevancy and pertinency of the statements to the legislative investigation are questions of law for the court. In order for it to be held that the defense of privilege is not available, it must appear that the statements are so irrelevant to the subject matter of the investigation that no reasonable man can doubt their irrelevancy and impropriety.

It has been held that in the absence of anything showing malice, one is not guilty of libel who sends to the Federal Department of Justice, for use before a Senate committee, an affidavit containing criminatory matter against one who has preferred charges against the qualifications and fitness of another for office, although the testimony therein contained is not pertinent to the subject of inquiry before the committee.

In some instances, proceedings before legislative or administrative authorities have been held not to be within the protection of the rule of absolute privilege, but to be only qualifiedly privileged. It seems that only a conditional privilege attaches to the statements of persons who appear, without being served with a subpoena, before a legislative or quasi-legislative committee or council.

50 Am. Jur. 2d *Libel and Slander* §223 (1970). *See also,* Restatement (Second) of Torts §590A.

their legislators and if we are going to stifle them from doing so because they might make some mistake in what they say, then this prevents this exchange, this giving of information on which the legislators base their action. This would be harmful to not only our way of life, but our way of legislating; our way of getting information. And this way of obtaining information, that's the reason for absolute privilege when you're petitioning legislative bodies.

He then told the jury that they would have to decide whether the facts, as presented in evidence, constituted "petitioning":

So if one is petitioning, what he or she says is absolutely privileged. What constitutes petitioning is not clearly defined. It would appear to embrace more than the literal definition of the term, that is, bringing in a petition with a lot of signatures on it and handing it to the County Commissioners. It might be certainly any position taken on an issue or matter before the Commissioners prior to the time the decision was made. Whether what Mrs. Hull was doing after the decision had been made and whether this would be absolute privilege, would amount to a petition, we will leave for you Ladies and Gentlemen to decide, based upon what I have told you.

We find no error in this instruction. The privilege is derived from the First Amendment to the United States Constitution, which provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; *or the right of the people peacefully to assemble, and to petition the government for a redress of grievances."* (emphasis supplied). This provision has been made applicable to the individual states through the Fourteenth Amendment. *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 512-13 (1939); *DeJonge v. Oregon,* 299 U.S. 353, 364 (1937).

The Supreme Court has stated that "the rights to assemble peacefully and to petition for redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights," *United Mine Workers of America v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967) and has called the right "a sanctity and a sanction not permitting dubious intrusions." *Thomas v. Collins,* 323 U.S. 516, 530 (1945). The right to petition for redress of grievances can be traced back to 1215 when King John of England signed the Magna Carta. *See,* Nowak, Rotunda, and Young, *Constitutional Law,* ch. 18 §XVI at 838 (1978).

In a trilogy of cases, the Supreme Court has held that the right to petition protects the freedom to seek redress from all three coordinate branches of government. In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961), a group of trucking companies instituted suit against a group of railroads to obtain damages and restrain them from an alleged conspiracy to monopolize the long distance freight business in violation of the antitrust laws. The trucking companies' complaint alleged that the railroads had engaged a public relations firm to conduct a publicity campaign against the truckers which was designed to foster the adoption and retention of laws and law enforcement practices destructive to the trucking industry. One of the charges was that the railroads had succeeded in persuading the Governor of Pennsylvania to veto a measure known as the Fair Truck Bill which would have permitted truckers to carry heavier loads over Pennsylvania roads. The Supreme Court held that the Sherman Act could not be used to impose civil sanctions for a publicity campaign aimed at influencing the legislature, even where the campaign was designed to stifle competition from the trucking industry.

Speaking for the Court, Justice Black observed:

[S]uch a holding [that the Sherman Act forbids associations for the purpose of influencing the passage or enforcement of laws] would substantially impair the power of government to

take actions through its legislature and executive that operate to restrain trade. *In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives.* To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose that would have no basis whatever in the legislative history of that Act. Secondly, and of at least equal significance, such a construction of the Sherman Act would raise important constitutional questions. *The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to evade these freedoms. . . .* [W]e think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws. (emphasis supplied).

*Id.* at 137-38 (footnotes omitted). Justice Black further commented: "The right of the people to inform their representatives in government of their desires with respect to passage or enforcement of laws cannot properly be made to depend upon their intent in doing so." *Id.* at 139.

In *United Mine Workers of America v. Pennington,* 381 U.S. 657 (1965), a suit was brought against the United Mine Workers and certain coal companies alleging that the defendants had lobbied the Secretary of Labor to obtain adjustments to the Tennessee Valley Authority coal purchasing policy in order to drive small coal companies out

of business. The Supreme Court held that concerted efforts to influence the conduct of executive officials are privileged, even if undertaken with an anticompetitive purpose. In *Pennington,* the Court took the opportunity to discuss the scope of *Noerr* and stated that, *"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 670.

The defendants had set up a trust fund to finance opposition to all applications the plaintiff would need to make to the agencies involved in regulating trucking in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972). The complaint alleged a concerted action by the defendants to institute state and federal proceedings to resist and defeat applications by the plaintiffs to acquire operating rights or to transfer or register those rights. These activities, it was alleged, extended to rehearings and to reviews or appeals from agency or court decisions on these matters. The Supreme Court held that the right to petition encompasses attempts to obtain redress through the institution of administrative and judicial proceedings. However, the Court observed, the petitioning privilege would not protect against antitrust liability where the alleged conspiracy "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id.* at 511 *(quoting Noerr, supra).*

For other cases where a particular petitioning activity to public officials has been afforded First Amendment protection, despite allegations of malicious intent, ulterior motivation, or knowing falsity, *see City of Long Beach v. Bozek,* 31 Cal. 3d 527, 183 Cal. Rptr. 86, 645 P.2d 137 (1982) (bringing of suits against the government is an absolutely privileged form of petitioning and therefore governmental entities may not maintain actions for malicious prosecution against those who have previously sued such entities unsuccessfully); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607 (8th Cir. 1980) (private citizens absolutely privileged to petition for zoning amendment, despite

consequential harm to plaintiff); *Missouri v. National Organization for Women, Inc.,* 620 F.2d 1301 (8th Cir. 1980) (NOW's boycott of Missouri determined to be absolutely privileged under the right to petition); *Weiss v. Willow Tree Civic Ass'n,* 467 F.Supp. 803 (S.D.N.Y. 1979) (lobbying town officials and filing complaints to oppose zoning permits was absolutely privileged).

In *Streif v. Bovinette,* 88 Ill. App. 3d 1079, 411 N.E.2d 341 (1980), the Appellate Court of Illinois recognized the expansion which had occurred in the right to petition, noting that it now "comprehends demands for an exercise by the Government of its powers in furtherance of the interest and prosperity of the petitioners . . ." 411 N.E.2d at 344 (*quoting The Constitution of the United States of America: Analysis and Interpretation* 915 (6th Ed. 1964)), "A citizen's right to communicate and to address his government in matters which he deems to be important cannot be lightly subjected to restraint." *Streif, supra,* 411 N.E.2d at 345.

The right to petition has been held to provide a defense of absolute privilege to common law tortious business interference. *See, Sierra Club v. Butz,* 349 F.Supp. 934, 936 (N.D. Calif. 1972). *Sierra Club* involved a counterclaim for intentional interference with advantageous relationship and for fraudulent misrepresentation against an environmental group which had been asserting administrative appeals and filing written and oral complaints to persuade the Federal government to preserve wilderness areas and reduce timber sales. In dismissing the claims, the court held that the privilege created by the First Amendment, guaranteeing the right of people to petition government for redress of grievances, protected the Sierra Club from common law tort liability.

In *Webb v. Fury,* 282 S.E.2d 28 (W.Va. 1981), a coal company brought a defamation suit against two private environmental groups. The environmental groups had published a newsletter concerning water pollution from the coal corporation's mining activities. Additionally, the environmental groups had requested the Office of Surface

Mining to inspect the coal company's mining operations and had requested the Environmental Protection Agency to conduct a hearing to reconsider the Agency's decision to grant the coal company's water pollution control permits. The Supreme Court of Appeals of West Virginia held that the environmental groups' communications with the Office of Surface Mining and the Environmental Protection Agency were petitioning activities and thus absolutely privileged. The court further held that statements published in the newsletter which sought to exhort the public to demonstrate concern for rapidly expanding surface mining and the resulting pollution of the area's waters were also an absolutely privileged form of petitioning. The court reasoned that "the right to petition includes, among other things, activity designed to influence public sentiment concerning the passage and enforcement of laws as well as appeals for redress made directly to the government." *Id.* at 42.

There is one major exception to the petitioning privilege, however. The so-called "sham exception" removes otherwise valid petitioning activities from the protection of the *Noerr-Pennington* doctrine. In *Noerr, supra,* the Supreme Court suggested that a sham use of the petitioning process might not fall within the privilege. The exception was given explicit recognition in *California Motor Transport Co. v. Trucking Unlimited, supra.* In that case the Supreme Court distinguished between the influencing of public officials and the effective barring of competitors from meaningful access to government bodies through manipulation. Describing the contours of the sham exception *vis a vis* antitrust regulation, the United States District Court for the District of Columbia recently stated that ". . . the exception also applied when the relevant activities were intended not to secure governmental action but to harm others through deliberate abuse of the governmental process." *United States v. American Tel. and Tel. Co.,* 524 F.Supp. 1336, 1362 (D.D.C. 1981). The court continued "[t]o be a sham, the representation must go beyond the normal and legitimate exercises of the right to petition; it must amount to a

subversion of the integrity of the process." *Id.* at 1364. Quoting *Israel v. Baxter Laboratories, Inc.,* 466 F.2d 272, 278 (D.C. Cir. 1972), the court observed, "the sham exception reflects a basic concern for the integrity of the regulatory process, and for that reason 'no actions which impair the fair and impartial functioning of administrative agency should be able to hide behind the cloak of an antitrust exemption.' " *United States v. American Tel. and Tel. Co., supra,* 524 F.Supp. at 1362. *See generally, Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 662 F.2d 253 (D.C. Cir. 1981).

Webster's New Twentieth Century Dictionary (Unabridged) (2nd Ed. 1977) has defined the word "sham" as

1. formerly, a trick or fraud,
2. an imitation that is meant to deceive; a counterfeit; a deception; a fake,
3. a person who falsely affects a certain character. . .

In the instant case, the sham exception would be inapplicable. There was not the slightest suggestion that Hull, as a competitor, was attempting to interfere with the business relationships of Sherrard. As such, a jury instruction covering the sham exception even if it had been requested, would have been inapplicable and thus, was properly omitted by the trial judge. In practical effect, the jury by being instructed to determine whether Hull was petitioning was being asked to decide whether she was deceptively using the Board hearing not to secure governmental action but merely to harm Sherrard. So long as Hull's principal purpose of petitioning was to obtain some favorable governmental action, any consequential injury to Sherrard being merely incidental thereto, no defamation action may lie for exercising her right to petition her local legislative body. *Sierra Club v. Butz, supra,* 349 F.Supp. at 938-39.

Further, while there is some authority for the proposition that the privilege should be qualified by a malice standard,

we believe those authorities to be inapposite. The most recent, better reasoned cases hold the privilege to be absolute, and we believe that in order to give the breathing space which First Amendment rights need to survive, a malice standard should not be imposed under the circumstances of this case. In weighing the right of freedom from tortious conduct (in this case defamation) against the need for a legislative body to receive information enabling it to function,[3] the latter must prevail. The extension of the petitioning doctrine from antitrust cases to defamation cases is not an illogical one. Antitrust violations, while statutory, can be traced to the common law actions limiting restraints of trade and proscribing monopoly power and middlemen profits. The economic harm caused by antitrust violations can be as devastating as injury caused by damaging one's reputation through defamatory speech.

An intriguing observation was made by the commentator in Note, "Maryland's Summary Judgment Procedure in *New York Times* Defamation Cases — *Berkey v. Delia,*" 40 Md. L. Rev. 638, 664 (1981), where it was suggested that special importance should be placed upon the "right" to petition for redress of grievances, for linguistically, it is one of only two "rights" found in the language of the First Amendment. Because free speech is not set forth as a "right," but rather as a freedom, it was felt that arguably this designation by the founding fathers of the right to petition for a redress of grievances as a "right" may have been intentional. As such, this right to petition may be a more important form of speech than that protected by the freedom of speech clause. *Id.*[4]

---

3. *See,* Embrey v. Holly, 293 Md. 128, 129-30, 442 A.2d 966, 967 (1982), where Judge Digges observed for the Court of Appeals that:

> Ever since the United States Supreme Court in the case of *New York Times v. Sullivan* declared in 1964 that laws of libel and slander are incompatible with the concepts underlying the first amendment of the federal constitution, courts have struggled to strike a proper balance between the interest of an individual in guarding his reputation and the federally protected free speech values that in many ways represent the essence of our democratic society. (footnotes omitted).

4. *Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980) was a defamation

However, *c.f., Thomas v. Collins, supra,* 323 U.S. at 530.

As early as 1845, the Supreme Court recognized that a petitioning privilege might exist in defamation actions. In *White v. Nicholls,* 44 U.S. (3 How.) 266 (1845), the Court was faced with a defamation action brought as a result of communications and resolutions sent to the President and Secretary of the Treasury, urging the removal of an allegedly unfit customs collector. The Court rejected the application of an absolute privilege, however, based upon the English case of *Lake v. King,* 1 Saund. 120 (1966). It held that:

> [M]alice may be proved, although alleged to have existed in the proceedings before a court, or legislative body, or any other tribunal or authority, although such court, legislative body or other tribunal may have been the appropriate authority for redressing the grievance represented to it; and that proof of express malice in any written publication, petition or proceeding addressed to such tribunal will render that publication, petition, or proceeding, libelous in character, and actionable, and will subject the author and publisher thereof to all the consequences of libel.

44 U.S. (3 How.) at 291. This case was decided before judicial and legislative privileges were held absolute and before the decisions in *Noerr-Pennington.* Thus, its applicability to the instant appeal is questionable at best.

While the question of whether the petitioning privilege should be absolute or qualified has resulted in a split of

---

action based upon a letter written by a psychiatrist whose car had been stopped by a police officer to that police officer's superior questioning the officer's mental competency. The majority, without discussing the petitioning for redress of grievances clause, held that actual malice would need to be shown in order for the police officer to recover and therefore the granting of defendant's motion for summary judgment was improper. The dissent however, by Judges Eldridge and Cole, commented that a libel action founded upon a citizen's complaint to an official's superior "may well implicate the 'redress of grievances' clause of the First Amendment." *Id.* at 339, 413 A.2d at 188. As the majority in *Berkey* did not address the petitioning issue, our holding today is not inconsistent with that case.

authority, a number of states which have decided the precise issue have found the privilege to be absolute. *See, Lininger v. Knight,* 123 Colo. 213, 226 P.2d 809 (1951) (petition presented to Board of County Commissioners for revocation of plaintiff's liquor license, alleging that the club "is a hideout for people who want to drink and carry on in a manner objectionable to the established morals of this community" held absolutely privileged); *Yancey v. Commonwealth,* 135 Ky. 207, 122 S.W. 123 (1909) (petition by judge seeking impeachment of county attorney for misconduct and corruption which had been sent to legislators held absolutely privileged assuming good faith belief that attorneys' conduct warranted removal); *Werner v. Ascher,* 86 Wis. 349, 56 N.W. 869 (1893) (absolute privilege would exist if petition to local Board of Supervisors seeking revocation of plaintiff's liquor license were published only to Board and not to public); *see also, Campo v. Rega,* 79 A.D.2d 626, 433 N.Y.S.2d 630, 631 (1980) (absolute privilege for citizen complaint regarding policeman's conduct); *Rusack v. Harsha,* 470 F. Supp. 285, 297 (M.D.Pa. 1978) (absolute privilege to report possible criminal violations to appropriate officials); *Wieman v. Mabee,* 45 Mich. 484, 8 N.W. 71 (1881) (communication made to superintendent of schools in affidavit alleged bad moral character and unfitness of teacher to teach held "fully privileged" where made by persons interested in the school, to the person qualified to receive and act on the petition, for an honest purpose, and with an honest belief in the justice of their action).

*Compare,* however, *Arlington Heights Nat'l Bank v. Arlington Heights Fed. Savings and Loan Assoc.,* 37 Ill.2d 546, 229 N.E.2d 514 (1967) (qualified privilege for citizen to petition his local legislative body in tort action based upon intentional inducement to breach contract); *State v. Kerekes,* 225 Or. 352, 357 P.2d 413 (1960) (qualified privilege exists for private person who addresses a written complaint to a city manager contending that police had illegally removed items from his house); *Magness v. Pledger,* 334 P.2d 792 (Okla. 1959) (Court recognized qualified

privilege for petitioning under state statute but found that libelous statement made in petition to the state Attorney General requesting investigation not to be privileged under the statute where the Attorney General was not authorized to act upon this petition); *Alabama Ride Co. v. Vance,* 6 Div. 219, 178 S. 438 (1938) (petition to City Commission to remove a carnival held subject to qualified privilege); *Pinn v. Lawson,* 72 F.2d 742 (D.C.Cir. 1934) (qualified privilege for communication sent to deacon board of church alleging misappropriation of funds by plaintiff pastor); *Manley v. Harer,* 264 P. 937 (Mont. 1928) (qualified privilege for letter sent to County Commissioners regarding quality of work of roads supervisor); *Andrews v. Gardiner,* 224 N.Y. 440, 121 N.E. 341, 2 A.L.R. 1371 (1918) (recognized qualified privilege for attorney who was seeking pardon for client who had been convicted of murder); *Koehler v. Dubose,* 200 S.W. 238 (Tex. Civ. App. 1918) (court recognized a privilege based upon petitioning for redress of grievances where an individual seeks redress from government); *McKee v. Hughes,* 133 Tenn. 455, 181 S.W. 930 (1916) (in a conspiracy qualified privilege exists for libel in petitions by citizens sent to board of mayor and aldermen declaring the plaintiff's place of business a nuisance); *McAllister v. Detroit Free Press Co.,* 76 Mich. 338, 43 N.W. 431 (1889) (while qualified privilege exists for communications made to a body or officer having power to redress a grievance complained of, no privilege exists for newspaper proprietors in dissemination of news); *Kent v. Bongartz,* 15 R.I. 72, 22 A. 1023 (1885) (qualified privilege exists for citizens who signed petition addressed to common council of city seeking removal of constable for poor job performance); 53 C.J.S. *Libel and Slander* §116 (1948); 50 Am.Jur.2d *Libel and Slander* §217 (1970).

The U.S. Court of Appeals for the Fourth Circuit held the petitioning privilege to be a qualified one in *Bradley v. Computer Sciences Corp.,* 643 F.2d 1029 (4th Cir. 1981). *Bradley* relied upon *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329 (7th Cir. 1977), *cert. den.,* 434 U.S. 975 (1977) in so holding. A close examination of the briefs and records

in *Bradley* reveals, however, that the question of whether the privilege should be absolute or qualified was never at issue. Furthermore, the Fourth Circuit's reliance on *Stern* may be misplaced. In *Stern,* a suit brought under 42 U.S.C. §1985 by an Internal Revenue agent who had been the subject of complaints concerning his job performance, the U.S. Court of Appeals for the Fourth Circuit rejected a malice standard for petitioning activities. While recognizing that a state's interest in protecting its citizens from common law torts may justify overriding First Amendment considerations when knowing falsity is alleged, the court found an absolute privilege for the subject communications. Citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748 (1976) for the proposition that "falsehood has never been protected for its own sake," the court rejected the imposition of a malice standard, recognizing the potential chilling effect on individuals contemplating the lodging of a good faith complaint. *Stern, supra,* 547 F.2d at 1345. The words of Judge Pell in *Stern* remind us of the importance of the individual's right to petition for a redress of grievances:

> No citation of authorities is needed for the proposition that the rights our founding fathers set down in the First Amendment are the subject of special protection by the courts. Those rights despite their theoretical strength as a constituent of democratic government have demonstrated remarkable fragility when exposed to the air of autocracy. While their protection should be the concern of all every year, it is particularly appropriate at the termination of the Bicentennial year of our nation to recall that the document which occasioned that celebration concluded its recital of grievances against a despotic ruler in these words:
>
>> In every stage of these Oppressions we have Petitioned For Redress in the most humble Terms: Our repeated Petitions have been answered only by repeated Injury. A Prince,

> whose Character is thus marked by every act
> which may define a Tyrant, is unfit to be the
> Ruler of a free People.

*Id.* at 1346.

Those cases which would hold the privilege to be qualified generally predate *Noerr-Pennington* or are distinguishable in that they do not relate to the direct petitioning of a legislative body. In light of the evolution of the petitioning doctrine, we therefore find them to be unpersuasive. The modern, better reasoned cases hold that true petitioning activity should be absolutely privileged.

There is a common thread which runs through the fabric of absolute defamation immunity as applied in Maryland. The judge and jury in the trial and the senator, delegate and councilperson in the legislative proceeding have a common need to receive as much information as is available in order to render a proper and informed decision.

Having concluded, as a matter of law, that an absolute privilege exists, we turn to the court's action in denying the motions for directed verdict and submitting to the jury the question of whether Mrs. Hull, in fact, made the comments in the course of petitioning the Board. In *Brinsfield v. Howeth,* 107 Md. 278, 287, 68 A. 566, 568 (1908), the Court of Appeals, with reference to the submission to the jury of the question of privileged publications remarked, "If however, the evidence is uncertain and conflicting, it is proper for the Court to instruct as to what facts amount to privilege, and leave it to the jury to determine whether those facts are proved." *Accord, Restatement (Second) of Torts,* §619 Comment (a) (1977).

Mrs. Hull's activities were of the type that could have constituted petitioning and protected her from defamation liability. She was appearing at a regular meeting of a legislative body [5] and could have been seeking redress of grievances caused by the action of the Board. She had the right to and was encouraged to speak out at these fora to the

---

5. *See,* Article 66B of the Maryland Annotated Code (1978 Repl. Vol.) which gives zoning powers to the county commissioners as the local legislative body and Chapter 47 of the Cecil County Code.

very body which had the power to address many of the concerns she raised. She may have been found to have been discussing reconsideration of the zoning decision. The Board had the power to reconsider its decision of the previous day. *See, Dal Maso v. Board of County Comm'rs,* 182 Md. 200, 34 A.2d 464 (1943); *Zoning Appeal Board v. McKinney,* 174 Md. 551, 564, 199 A. 540, 546 (1938); 73 C.J.S. *Public Administrative Bodies and Procedure* §156.[6]

Accordingly, we hold that the trial judge did not err in permitting the jury to determine whether the facts in this case constituted petitioning for redress of grievances. Upon this record, a directed verdict for either party would have been inappropriate. We have no basis of knowledge as to whether the jury based its verdicts on absolute or conditional privilege.[7] However, the facts in this case were of the type that could have constituted petitioning and therefore the petitioning instructions to the jury were proper.

The decision we make today is founded upon the necessity of a legislative body to receive information enabling it to legislate. The right of petition is a necessary element of our representative government, for it enables persons to inform the government of actual or perceived wrongs. It is to be distinguished from First Amendment freedoms, such as free speech in defamation settings which generally involve communications made by one individual to another and are

---

6. In *McKinney,* the Court of Appeals commented, "It may be conceded without discussion that the [Zoning Appeals] Board has the right to correct errors in its decisions caused by fraud, surprise, mistake or inadvertence, which any agency exercising judicial functions must have, to adequately perform its duties." 174 Md. at 564, 199 A. at 546.

Whether or not the Board had the power to reconsider its decision may not be relevant under the *Noerr-Pennington* doctrine. A good faith bona fide mistake by the petitioner with respect to the power of the Board to review its earlier decision would not affect the right to petition under the First Amendment, given the underlying policy considerations for the privilege. In the instant case, it appears that Hull appeared before the Board when it still had the power to reconsider its decision of the previous day.

7. The case was submitted on the following two issues to the jury:
   1. Did the defendant slander the plaintiff?
   2. Did the defendant libel the plaintiff?

The jury answered both in the negative. The jury could have found the existence of but a qualified privilege. The trial judge had instructed the jury on both qualified and absolute privilege and we therefore have no basis of knowledge as to how the jury made its findings.

not directed at obtaining governmental action. It is the role of the government in this scenario which persuades us to hold the privilege to be absolute, indefeasible by malice. Underlying our decision is the safeguard that the comments be relevant to the proceedings in order to be classified as "petitioning." This safeguard in effect goes beyond those found in both the judicial and legislative privileges. For example, in the Restatement (Second) of Torts §587, comment (c) (1977), it is observed with reference to the judicial privilege, "It is not necessary that defamatory matter be relevant or material to any issue before the court. It is enough that it have some reference to the subject of the injury." This provision is incorporated by reference to legislative privilege in Restatement (Second) of Torts §590A (1977). Although Maryland does not apply a relevance standard with respect to witness testimony in a judicial setting, *Korb v. Kowaleviocz, supra,* we believe that it is necessary to impose such a standard with respect to the instant petitioning privilege. In weighing the public interest in free disclosure through petitioning to a legislative body against the potential harm to individuals who may be defamed, we by necessity circumscribe the meaning of "petitioning" insofar as it might give rise to an absolute defamation privilege. Inherent in the words "petitioning for redress of grievances" is the concept that the words contained in the petition will relate to the redress sought and that the petitioner is genuinely seeking redress. If irrelevant or a sham, the comments of the speaker may never be classified as petitioning. What is relevant or what constitutes a sham must be decided on a case-by-case basis.

II. *Preservation of Issues for Appeal*

Next, we address the question of whether certain issues were properly preserved for appeal. When the trial judge instructed the jury on absolute privilege for petitioning activities, counsel for appellant objected as follows:

> MR. FOCKLER: My next exception relates to the Court's instruction on absolute privilege. I feel that

the area of absolute privilege is something for the Court to determine, not the jury, and I think —

THE COURT: For the Court to determine?

MR. FOCKLER: Yes, sir. And I think that under the circumstances in the Ambrose case, I think that it is the discretion for the Court to present it to the jury.

On appeal appellee contends that "Counsel for the appellant excepted to the *fact* that the judge instructed the jury on absolute privilege but not as to the *form* of that instruction." As such, because no objection as to the instruction was made, appellee submits that the issue is not properly before us. We disagree.

Maryland Rule 554 provides in relevant part:

*Rule 554. Instructions to the Jury . . . . . Law*
\* \* \*

d. *Objection.*

If a party has an objection to any portion of any instruction given, or to any omission therefrom, or the failure to give any instruction, he shall before the jury retires to consider its verdict make such objection stating distinctly the portion, or omission, or failure to instruct to which he objects and the ground of his objection. Opportunity shall be given to make the objection in open court out of the hearing of the jury upon application either orally or in writing, made before or after the conclusion of the charge.

e. *Appeal.*

Upon appeal a party in assigning error in the instructions, shall be restricted to (1) the particular portion of the instructions given or the particular omission therefrom or the particular failure to instruct distinctly objected to before the jury retired and (2) the grounds of objection distinctly stated at the time, and no other errors or assignments of error

in the instructions shall be considered by the appellate court.

The purpose of the rule is to give the trial judge an opportunity to add to or correct his instructions. *State v. Wooleyhan Transport Co.,* 192 Md. 686, 65 A.2d 321 (1949); *Kraft v. Freedman,* 15 Md. App. 187, 193, 289 A.2d 614 (1972). On the broad question of whether an absolute privilege òr no privilege at all should have been applicable, appellant's objection was sufficient to have enabled Judge Mackey to change his instruction if he so desired. More importantly, the objection specifically refers to *Gersh v. Ambrose, supra,* which would be sufficient to raise the question of the propriety of an instruction based upon absolute immunity. Additionally, even if appellant had not preserved the question at the time of the jury instruction, the issue was preserved by way of his opposition to appellee's motion for directed verdict and denial of his motion for directed verdict, where it was argued that no such absolute privilege existed. Thus, the issue has been properly preserved for our review.

Next, at one point in his brief, appellant suggests that "while the Cecil County Board of Commissioners might be considered a legislative body, it was not engaged in the process of legislation when Ms. Hull appeared and made the above-mentioned defamatory statements." This issue, however, was not properly preserved. The trial judge told the jury that "for our purpose the County Commissioners meeting in regular session as they were in this instance, are considered to be and come under the definition of a legislature." Absent an objection by appellant to this portion of the instruction, we shall not consider it. Maryland Rule 554.[8]

III. *Appellant's Motion for Directed Verdict*

In *Embrey v. Holly,* 48 Md. App. 571, 429 A.2d 251 (1981),

---

8. In any event, we find this contention to be without merit. See, note 6, *supra.*

*modified,* 293 Md. 128, 442 A.2d 966 (1982), this court reviewed and enunciated "the three requisite elements of a *prima facie* case of defamation":

Firstly, the alleged defamatory statement of activity, whether oral (slander) or written (libel), must expose a person to "public scorn, hatred, contempt or ridicule" and, thus, be injurious to his reputation. *Thompson v. Upton,* 218 Md. 433, 437, 146 A.2d 880, 883 (1958). *See American Stores Co. v. Byrd,* 229 Md. 5, 13, 181 A.2d 333, 337 (1962). *See also Restatement (Second) of Torts* 559 (1977); Prosser, *Law of Torts,* §111 (4th ed. 1971). A publication is libelous *per se* and presumed to be injurious to one's reputation if, on its face, the "words themselves impute the defamatory character...." *Metromedia, Inc. v. Hillman,* 285 Md. 161, 172, 400 A.2d 1117, 1123 (1979). The defamatory nature of a publication is, of course, not always apparent on its face. In that event, it is termed a defamation *per quod. Id.* at 172-73, 400 A.2d at 1123. To support a *per quod* action, extrinsic circumstances must be introduced through inducement, colloquium and innuendo.

Secondly, the alleged defamatory publication must be publicized to a third party, and that party must reasonably understand the publication to be defamatory. *Werber v. Klopfer,* 260 Md. 486, 496, 272 A.2d 631, 635 (1971); *Great Atlantic and Pacific Tea Co., Inc. v. Paul,* 256 Md. 643, 648, 261 A.2d 731, 734-35 (1970).

The third and final requirement of a *prima facie* case of defamation is that damages to the individual's reputation must be proven. The old axiom that libel and slander *per se* equals damages, has, in the manner of the "old soldier," just "fade[d] away." The Supreme Court, in a trilogy of decisions, administered the *coup de grace* to the *per*

*se* equals damages apothegm as follows: 1) In *New York Times v. Sullivan, supra* [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)], *per se* damages, insofar as "public officials" are concerned, have disappeared from the law, 2) *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) eradicated the *per se* damage concept with respect to public figures, and 3) *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), eliminated the awarding of *per se* damages where a private individual was defamed. All three cases make clear that even some defamatory speech is protected under the First and Fourteenth Amendments. Therefore, presumed damages and strict liability are no longer viable in defamation cases.

Where a *public figure* is the injured party, damages will be awarded if the source of the defamation acted with actual malice. The term "actual malice" is held to mean publishing the comment while knowing of its falsity or acting with reckless disregard for the truth. *New York Times, supra; Curtis Publishing Co., supra; A.S. Abell Co. [v. Barnes], supra* [258 Md. 56, 265 A.2d 207 (1970), *cert. denied,* 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971)]. The rule with respect to private persons is less stringent. A *private person* who is the object of a defamatory publication need only show that the source of the defamation acted negligently in failing to ascertain its defamatory character. *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 596-97, 350 A.2d 688, 697 (1976).

48 Md. App. 571 at 579-81, 429 A.2d at 258-59 (footnotes omitted).

The appellant contends on appeal that all the elements of a *prima facie* case of defamation were made out at trial and that the trial court improperly denied his motion for a directed verdict. In *General Motors Corp. v. Lahocki,* 286

Md. 714, 733, 410 A.2d 1039, 1049 (1980) the Court of Appeals said with reference to the standard for a directed verdict:

> In considering a motion for a directed verdict the trial court assumes the truth of all credible evidence on the issue and of all inferences fairly deducible therefrom. It then considers them in the light most favorable to the party against whom the motion is made. *Impala Platinum v. Impala Sales,* 283 Md. 296, 328, 389 A.2d 887 (1978) and cases there cited. If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by directing a verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied. *Id.*

Thus, in our consideration of the appellant's motion for a directed verdict, we look upon the evidence which was before Judge Mackey in a light most favorable to the appellee. We agree with the appellee that the evidence was replete with conflicting facts and competing inferences as to the nature and meaning of Hull's comment, the context in which it was asked, her knowledge at the time it was posed and the contested reputational injury resulting therefrom. The trial judge properly refused to direct a verdict for the appellant in this case.

We disagree with appellant's contention that the statement, "I would like to know how much money it cost Warwick" was defamatory *per se.* A publication is libelous *per se* and presumed to be injurious to one's reputation if, on its face, the "words themselves impute the defamatory character," *Metromedia, supra,* 285 Md. at 172, 400 A.2d at 1123. While bribery of a public official to obtain his vote on a rezoning matter would be a criminal offense under Md. Ann. Code art. 27, §23 (1982 Repl. Vol.), we do not believe that *on its face* the words "I would like to know how much

money it cost Warwick" impute the defamatory character necessary for a statement to be classified as defamatory *per se*. As appellee correctly points out, the comment is capable of other meanings besides imputing the exchange of money for a vote. Because the statement was not defamatory *per se,* it was necessary for the jury to determine from the evidence at trial the context in which the words were spoken and whether they were capable of a defamatory meaning. *M & S Furniture Sales Co. v. Edward J. DeBartolo Corp.,* 249 Md. 540, 241 A.2d 126 (1968).

The parties do not dispute the second element of a defamation, that of a publication of the statement to third parties.

The final element of defamation, damage to the plaintiff's reputation, also provided the trial court with reason to deny a directed verdict. Reasonable minds could have differed as to whether the reputation of Sherrard had been tarnished by Hull's comment. Appellant introduced minimal evidence to show the effect of the statement on him. At best, it caused him emotional stress, for which he apparently abandoned his claim, and had a speculative future effect on his business and political careers. It was for the jury to determine whether Sherrard had suffered damage to his reputation.

The plaintiff further contends that the alleged defamatory statement was made with actual malice. If Sherrard was a public figure by virtue of his having run for local office on two prior occasions and being a prominent businessman in the community, he bore the burden of showing by clear and convincing proof that Hull's statement was made with actual malice, *i.e.,* "while knowing of its falsity or acting with reckless disregard for the truth." *Berkey v. Delia,* 287 Md. 302, 317-18, 413 A.2d 170, 177 (1980); *Embrey v. Holly, supra,* 48 Md. App. at 581, 429 A.2d at 259. Appellant argues that the following cross-examination of Hull establishes the requisite malice as a matter of law:

Q.   I see. You did state to Mr. Ragan, "How much did it cost Warwick?"

A.  Yes, sir. I asked the question.

Q.  What did you mean when you said, "How much did it cost Warwick?"

A.  I don't know.

Q.  In what context were you speaking?

A.  I don't know. As I said, I was hot.

Q.  So you just said, "How much did it cost Warwick?"

A.  Yes, sir.

Q.  But you don't know what you were talking about?

A.  I don't know why I said it.

Q.  Did you have any proof or did you have anything to lead you to believe that something might have cost Warwick something?

A.  I didn't see Warwick pass any money, so I didn't say he paid off.

Q.  Did anybody — What pay off?

A.  Well, talking about money.

Q.  Money? I see. Did anyone tell you that something cost Warwick money?

A.  No sir. I don't know anything about anything like that.

Q.  Did you have any reason at all to believe that this zoning cost Warwick any money?

A.  No sir.

Q.  You didn't mention the rezoning at the meeting?

A.  I didn't talk about that.

We disagree with the appellant that this exchange proved by clear and unconvincing evidence the fact that the defendant made the comment while knowing of its falsity. This was a question for the jury and a directed verdict would have been inappropriate. Although Hull admitted that she had no proof that the rezoning cost Sherrard any money, the

evidence does not establish as a matter of law that she entertained serious doubts about the statement she made at the April 15, 1980 meeting of the Board. *See, Hohman v. A.S. Abell Co.,* 44 Md. App. 193, 407 A.2d 794 (1979).[9] In any event, if the jury found that she was petitioning, then malice would have been immaterial.

For all of the above reasons, the trial court could have found legally relevant and competent evidence from which a rational trier of fact could infer a fact in issue, and thus, the appellant's motion for a directed verdict was properly denied. *General Motors Corp. v. Lahocki, supra.*

> *Judgment affirmed; appellant to pay the costs.*

---

**9.** Appellant's reliance on Cantrell v. Forest City Publishing Co., 419 U.S. 245 (1974) is misplaced. In *Cantrell,* the statements, which were conceded by the parties to have contained a number of inaccuracies and false statements, were capable of but one meaning. This is not so in the case *sub judice.*