471 A.2d 752

**Brodia Lee BASS, Jr.**

v.

**Raquel ROHR.**

**No. 663, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Feb. 14, 1984.

Certiorari Granted June 7, 1984.

610

Leonard Z. Bulman, Annapolis, for appellant.

Michael P. Darrow, Annapolis, for appellee.

Argued before, WILNER, WEANT and GARRITY, JJ.

WILNER, Judge.

In 1962, the General Assembly enacted the State Home Improvement Law. As presently codified in Md.Code Ann. art. 56, §§ 245–269A, the law provides for the licensing of home improvement contractors, requires each licensee to post a bond for the benefit of its customers, prohibits licensees from engaging in certain conduct, and provides both civil and criminal penalties for violations of the law. Administration and enforcement of the law is committed to the Maryland Home-Improvement Commission, a body created by the statute, whose members are appointed by the Governor. The law is a regulatory one for the protection of the public. *Harry Berenter, Inc. v. Berman*, 258 Md. 290, 294, 265 A.2d 759 (1970).

The issue now before us is whether a person who files a complaint with the Commission against a home improvement contractor subject to its jurisdiction may be held liable for defamation by reason of what the complainant says in the complaint and in the course of the proceeding conducted pursuant to it. The Circuit Court for Anne Arundel County, by directing verdicts in favor of the appellee homeowner, concluded that she—the complainant before the Commission—was protected by an absolute privilege and thus could not be held liable. We agree that appellee is protected by an absolute privilege, but a different one than that applied by the circuit court.

## I. *Background*

In May, 1981, appellee Raquel Rohr engaged appellant Brodia Bass, Jr., a licensed home improvement contractor, to do some substantial renovation work to her home. The initial written contract was signed May 4, 1981; a modification of it, providing for certain additional work, was signed

June 16, 1981. Eventually, a number of disputes arose with respect to both the scope and progress of the work and the amounts due by Ms. Rohr during the construction, all of which culminated in (1) a confrontation between Ms. Rohr and Mr. Bass at the latter's home on July 5, 1981; (2) Mr. Bass declaring a default and leaving the job as of that date; and (3) Ms. Rohr making a complaint to the Home Improvement Commission.

On July 10, 1981, pursuant to what must have been an informal or telephonic complaint by Ms. Rohr, a Commission investigator, John Abruzzo, spoke with Ms. Rohr and inspected the work. He found "that a foundation had been poured, a shell constructed, and a roof with shingles. There were no windows or doors, and the interior and exterior were not completed." Mr. Abruzzo eventually made a written report of this inspection and of subsequent conversations with Mr. Bass, but that report was not submitted to the Commission until at least September 24, 1981.[1] In the meanwhile, on July 27, 1981, Ms. Rohr filed a formal written complaint with the Commission.

By checking boxes in the "Type of Complaint" section of the complaint form provided by the Commission, Ms. Rohr charged Mr. Bass with failing to complete the contract and with misrepresentation, both of which are "prohibited acts" under § 261(a) of art. 56. In particular she alleged that, pursuant to an oral modification to the written agreements, she paid Mr. Bass $1,000 to purchase and erect cedar siding and that he failed even to order the siding. She sought to recover $1,500 against the bond posted by Mr. Bass.

On August 3, 1981, Mr. Bass responded to the complaint. In a long letter to the Commission, he denied any wrongdoing and claimed that Ms. Rohr had "misrepresented the true facts." He denied the oral agreement alleged by Ms. Rohr, asserted that all work had been properly done, and averred

---

1. The typed report is dated April 8, 1982. Mr. Abruzzo testified, however, that it was "turned in" to the Commission on September 24, 1981.

that he left the job because Ms. Rohr refused to make payments due under the contract. On September 30, Mr. Bass wrote again to the Commission, noting that the open claim was hurting his business and asking that it be resolved.

In accordance with Commission practice and procedure, the complaint was referred to a staff employee, Ms. Sandra Harrell, to see if it could be amicably adjusted. To that end, Ms. Harrell conducted an informal conference with the parties on October 20, 1981, which proved unproductive. There is no transcript of what occurred at the conference, and we are therefore not privy to precisely what was said. It appears, however, from Mr. Bass's response of August 3, from Mr. Abruzzo's report, and from some handwritten notes of Ms. Harrell that one of the critical issues in the dispute was whether, at the time Mr. Bass formally abandoned the work on July 5, 1981, money was due to him on the "second draw." The contract of May 4, 1981, provided for payment of "$2,547.33 second draw when shell is up," and the parties were in disagreement as to whether the "shell" was up at that time.

At some point during the proceeding, Ms. Rohr submitted to the Commission a letter dated October 15, 1981, and purportedly signed by Ronald G. Beland, of B & G Contractors, who had been hired by Ms. Rohr to complete the work started by Mr. Bass. This letter had little to do with the question of whether the "shell" was up, but dealt instead with the quality of the work done by Mr. Bass. In the letter, Mr. Beland stated: "There were numerous things that had to be redone because of poor workmanship. Example, roof had to be completely re-installed. The floor had to be supported in another are[a] near door entrance area where much traffic would occur."

Ms. Harrell concluded that, because of the conflicting claims, the matter could not be informally adjusted; thus she referred the complaint for review by the full Commission.

The day after the informal conference, Ms. Harrell received a call from Mr. Beland asking that the aforequoted language in his letter be disregarded. In a letter to the Commission dated October 22, 1981, he formally asked to "retract" that paragraph. He explained that he did not wish to "question the workmanship [i]nvolved before I got to the job" and noted that "[n]aturally when a job isn't completed and finalized, there are numerous things that have to be done." Beland said that he had been asked by Ms. Rohr to write a statement in her behalf "as to payments received, and a good working relationship" and regarded himself as simply "in the middle of a bad situation between these two individuals."

On November 5, 1981, the Commission reviewed the Rohr complaint. As announced in a subsequent letter to Ms. Rohr from Ms. Harrell,

"After review of all the facts as they relate to your file they [the Commission] were not persuaded to initiate charges against the contractor for violation of the Home Improvement Law. They also declined to define the meaning of 'shell.' They were of the opinion this was a civil matter."

Ms. Rohr responded on December 2, 1981, that she was not satisfied with the Commission's decision and requested a formal hearing. The Commission denied that request on January 7, 1982. On behalf of the Commission, Ms. Harrell advised Ms. Rohr:

"After review of all relevant facts the Commission did not find that the contractor had either abandoned or breached his agreement with you. They were not persuaded to charge the contractor for violation of the Home Improvement Law. They confirmed their decision of November 5, 1981 that this was a civil matter."

With this determination, the parties' roles reversed: Bass became the complainant. On January 25, 1982, he sued Ms. Rohr for defamation. Ultimately, in an amended declara-

tion he alleged four separate acts of libel or slander; namely:

(1) Count One: slander committed in the presence of Ms. Rohr's friend and witness during the confrontation at Mr. Bass's home on July 5, 1981;

(2) Count Two: libel arising from the statements and charges made in the formal complaint to the Commission on July 27, 1981;

(3) Count Three: slander arising from defamatory statements made to Mr. Beland at some undefined point; and

(4) Count Four: libel arising from the October 15, 1981 letter purporting to be from Mr. Beland which, Bass averred, Rohr actually wrote and forged.

The case came to trial on March 22, 1983. At the end of the plaintiff's case, the court directed verdicts in favor of Ms. Rohr as to Counts Two, Three, and Four. It concluded, on the basis of this Court's decision in *Adams v. Peck,* 43 Md.App. 168, 403 A.2d 840 (1979), *aff'd* 288 Md. 1, 415 A.2d 292 (1980), and the decision of the Court of Appeals in *Gersh v. Ambrose,* 291 Md. 188, 434 A.2d 547 (1981), that Ms. Rohr was protected by an absolute privilege with respect to statements made in the course of the administrative proceedings before the Commission, including the informal conference conducted by Ms. Harrell. The motion was denied as to Count One—the incident at Mr. Bass's home—but the jury ultimately decided that issue in Ms. Rohr's favor.

In this appeal, Mr. Bass attacks the court's rulings on Counts Two, Three, and Four. He argues that the court erred in "finding that Maryland had adopted the doctrine of absolute privilege for libel and slander in administrative proceedings." He makes no complaint with respect to Count One.

## II. *Discussion*

### A. *Count Three—The Conversation With Mr. Beland*

We need not consider the question of privilege with respect to Count Three. We are unable to find in the record

extract any evidence in support of the allegations made in that count, and we must therefore assume that no such evidence was produced. Md.Rule 1028b. Quite apart from any matter of privilege, there is simply no basis in the record for us to conclude that the directed verdict entered on that count was incorrect.

### B. *Counts Two and Four—Privilege*

In considering the issue raised by Mr. Bass, it is necessary, at the outset, to observe that there are two types of privilege potentially applicable here, and to make clear the distinction between them.

The privilege discussed in *Adams v. Peck* and *Gersh v. Ambrose* is the common law privilege of a witness in a judicial proceeding to testify without fear of subsequent harassment by means of a suit for defamation. This privilege is not of Constitutional origin; it evolved from and is part of the law of libel and slander.

In 1888, the Court of Appeals adopted the rule laid down in English cases that witnesses and parties in judicial proceedings were not subject to liability for defamation by reason of what they said in court. Such persons were protected by an absolute, unconditional privilege that applied even if the statements complained of were irrelevant to the proceeding or were made maliciously. *Hunckel v. Voneiff*, 69 Md. 179, 14 A. 500 (1888); *Bartlett v. Christhilf*, 69 Md. 219, 14 A. 518 (1888). The rule, as to both witnesses and parties, was grounded upon public policy. As to witnesses, the Court held in *Hunckel*, 69 Md. at 187, 14 A. 500, "it is of the greatest importance to the administration of justice that witnesses should go on the stand with their minds absolutely free from apprehension that they may subject themselves to an action of slander for what they say while giving their testimony." Similarly, in the case of parties, the Court observed in *Bartlett*, 69 Md. at 227, 14 A. 518, "[t]o allow such suits to prevail would most effectively deter every one from presenting a well-founded complaint for fear of being pursued with 'infinite vexation.'"

The existence of this absolute privilege, for both parties and witnesses in judicial proceedings, has remained fixed in Maryland law since *Hunckel* and *Bartlett*. *See Korb v. Kowaleviocz*, 285 Md. 699, 402 A.2d 897 (1979).

*Adams v. Peck* and *Gersh v. Ambrose* addressed the question of whether the testimonial privilege of a witness extended to utterances made outside the courtroom. *Adams v. Peck* involved pre-trial statements made by a potential witness in a pending judicial proceeding. The statements were contained in a report to the attorney for one of the parties.

The Court of Appeals had earlier stated in *Kennedy v. Cannon*, 229 Md. 92, 97, 182 A.2d 54 (1962), that the absolute immunity enjoyed by witnesses and parties extended to defamatory statements "uttered in the course of a trial or contained in pleadings, affidavits, depositions, and other documents directly related to the case." Building upon that and upon the underlying public policy rationale for the privilege regarding judicial testimony, we and the Court of Appeals concluded that the testimonial privilege, which applied even in the face of malice, extended as well to pre-trial communications between potential witnesses and counsel. The precise holding reflected in the Court of Appeals Opinion was this: "We shall here hold that ordinarily an absolute privilege applies to a defamatory statement published in a document which is prepared for possible use in connection with a pending judicial proceeding but which has not been filed in that proceeding." 288 Md. at 4, 415 A.2d 292.

*Gersh v. Ambrose* tested whether the testimonial privilege applied to statements made by a witness in an administrative proceeding before the Baltimore City Community Relations Commission. In the course of what the Court termed "a public hearing," the witness Gersh allegedly accused Ambrose, a staff employee of the Commission, of obstruction of justice and subornation of perjury. Ambrose sued for

defamation and Gersh argued the protection of the absolute privilege.

The Court of Appeals observed that:

"Most American courts that have extended absolute immunity to witnesses testifying in other than strictly judicial, in-court settings have first assured themselves that in such settings there are sufficient judicial safeguards so as to minimize the likelihood of harm to potentially defamed (or otherwise injured) individuals who would have no legal remedy." 291 Md. at 192, 434 A.2d 547.

Conversely, in those cases where such immunity has not been so extended, two types of reasons have emerged: "Either the record failed to establish that the involved agency, while possessed of certain judicial or quasi-judicial duties, was engaged in such activities at the time the alleged injury took place, or certain elementary safeguards were simply not present." Id., 194, 434 A.2d 547.

Applying these principles and comparing the case before it with the English case of Trapp v. Mackie, [1979] 1 All E.R. 489, [1979] 1 W.L.R. 377 (H.L.1978), the Court determined that there was absent from the Community Relations Commission proceeding those "conditioning devices or safeguards which would create the free speaking atmosphere absolute witness immunity is designed to provide and which are present in judicial proceedings." The hearing at which Gersh made his remarks was not substantially different "from an ordinary open public meeting" and "[t]he public benefit to be derived from testimony at Commission hearings of this type is not sufficiently compelling to outweigh the possible damage to individual reputations to warrant absolute witness immunity." 291 Md. at 196, 434 A.2d 547.

The "bottom line" of Gersh is this:

"[W]hether absolute witness immunity will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards

which will minimize the occurrence of defamatory statements." *Id.,* 197, 434 A.2d 547.

As we observed initially in this discussion, the privilege available to parties and witnesses, whether absolute or qualified, evolves from, and is part of, the common law governing actions for defamation.

There is another, somewhat overlapping, privilege that is of Constitutional origin. It arises from the First Amendment right of the people "to petition the Government for a redress of grievances," a right that applies to the States through either or both the "due process" and the "privileges and immunity" clauses of the Fourteenth Amendment. *De-Jonge v. Oregon,* 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937); *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). This right rests not on mere public policy or convenience, but dates back to Magna Carta and has been held to be "among the most precious of the liberties safeguarded by the Bill of Rights." *Sherrard v. Hull,* 53 Md.App. 553, 561, 456 A.2d 59, *aff'd* 296 Md. 189, 460 A.2d 601 (1983), quoting *United Mine Workers of America v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967).

*Sherrard v. Hull* was a defamation action based upon comments made by Hull at a duly convened meeting of a board of county commissioners. We concluded that, if Hull's appearance before the board represented an exercise of her right of petition and if her comments were relevant to her petition, they were protected by an absolute privilege. Although noting that there was a split of authority as to whether the privilege should be a qualified one defeasible upon a showing of malice, we, and ultimately the Court of Appeals, determined that "[t]he most recent, better reasoned cases hold the privilege to be absolute," and thus rejected the malice standard. 53 Md.App. at 567, 456 A.2d 59. The only caveat to the privilege was that the conduct complained of actually amount to petitioning and that the words uttered be relevant to the petition. At p. 574, 456 A.2d 59:

"In weighing the public interest in free disclosure through petitioning to a legislative body against the potential harm to individuals who may be defamed, we by necessity circumscribe the meaning of 'petitioning' insofar as it might give rise to an absolute defamation privilege. Inherent in the words 'petitioning for redress of grievances' is the concept that the words contained in the petition will relate to the redress sought and that the petitioner is genuinely seeking redress. If irrelevant or a sham, the comments of the speaker may never be classified as petitioning. What is relevant or what constitutes a sham must be decided on a case-by-case basis."

The conclusions expressed in *Sherrard* with respect to petitioning a legislative body apply as well to petitioning an executive agency.[2] Indeed, the cases from other jurisdictions upon which we relied in *Sherrard* involved, for the most part, complaints made to executive agencies. *See* p. 569 of 53 Md.App., 456 A.2d 59; *also California Transport v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611–612, 30 L.Ed.2d 642 (1972); *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329 (7th Cir.), *cert. den.* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). Although the right of petition and the privilege flowing from it are often considered in the context of conduct designed to influence public bodies in the exercise of legislative or quasi-legislative authority, neither is limited to that. They apply as well to attempts by citizens to invoke the regulatory or enforcement authority of administrative agencies. *See, for example, Webb v. Fury,* 282 S.E.2d 28 (W.Va.1981).

█ There can be no doubt that, in filing and prosecuting her complaint to the Home Improvement Commission, Ms. Rohr was exercising her right of petition. The Legislature

---

**2.** As we pointed out in *Sherrard,* 53 Md.App. at 558, 456 A.2d 59, there is a separate common law privilege especially applicable to legislative proceedings. *See also* Maryland Declaration of. Rights, art. 13. We did not rely on that privilege, or on the State Constitutional right, in *Sherrard,* but decided the case on the basis of the privilege emanating from the First Amendment right of petition.

created the Commission as an arm of the State government in order to police the home improvement industry and to regulate contractors engaged in it; and one of its principal functions is to receive and consider customer complaints. It is, in fact, largely through the mechanism of such complaints that the Commission can keep abreast of how its licensees are behaving. Thus, from the point of view of both informing the agency in order that it may effectively discharge its public responsibilities and seeking redress from the agency of specific grievances, the filing and prosecution of complaints must be regarded as a protected activity to which the absolute privilege applies. The fact that Ms. Rohr may have proceeded without substantial justification or that she may have acted unfairly or maliciously would not defeat the privilege. *Sherrard v. Hull, supra.*

In light of the clear application of this Constitutionally-based privilege, we need not determine whether the common law privilege discussed in *Adams v. Peck* and *Gersh v. Ambrose* also might insulate Ms. Rohr from liability.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.