823 A.2d 566

**Glenn REICHARDT, et al.**

v.

**Christopher A. FLYNN.**

**No. 42, Sept. Term, 2000.**

Court of Appeals of Maryland.

May 8, 2003.

Richard E. Schimel (Budow and Noble, P.C., on brief), Bethesda, Walter H. Madden, Rockville, for petitioners.

Richard L. Swick (Swick & Shapiro, P.C., on brief), Washington, DC, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

ELDRIDGE, J.

We granted a petition for a writ of certiorari in this case to determine whether an absolute privilege defense applies to a defamation action involving communications made by students and parents to public school authorities about the perceived misconduct of a public school teacher and coach.

## I.

Christopher A. Flynn was employed in the Montgomery County public school system as a teacher since 1989 and as a high school track and cross-country coach from 1990 to 1998. From the 1994 school year, until the time of the petitioners' allegations, Flynn was Walt Whitman High School's only co-educational cross-country track team coach.

Petitioners, Joanna Zuercher and Claire White–Crane, joined the cross-country track team as high school freshmen in 1995. About 2 years later, on January 12, 1998, both students and their parents met with Walt Whitman High School Principal, Dr. Jerome Marco, to express their concerns regarding Flynn's behavior as a coach. According to the girls, their primary concerns related to alleged improper sexual comments made by Flynn and their perception that Flynn was more interested in coaching the male runners than the female

runners. The girls alleged that Flynn's conduct appeared contrary to the school system's written policies (titled: "Non-discrimination;" "Gender Equity;" and "Sexual Harassment") which promised gender equity and an environment free from discrimination and sexual harassment. Joanna and Claire also wrote to other officials of the Montgomery County public school system about Flynn's alleged misconduct.[1]

That same afternoon, Dr. Marco met with Flynn and informed him of the allegations, which Flynn denied. Later that evening, Dr. Marco decided to place Flynn on leave with pay from both his teaching and coaching positions beginning the next day. Two days later, on January 15, 1998, Flynn was formally suspended with pay by the Montgomery County Superintendent of Schools, Paul Vance, while the school system's Department of Personnel Services conducted a confidential investigation. Flynn remained suspended until May 11, 1998, when he was placed in a non-teaching position.

During the investigation, the school system personnel interviewed and received written statements regarding Flynn's conduct from more than 20 students. Flynn was able to obtain these statements from the school system's personnel during its investigation. In addition, Flynn and his counsel were given the opportunity to respond to all statements submitted during the investigation. Neither Flynn nor his counsel chose to do so.

Upon the conclusion of the investigation in July 1998, the School Superintendent issued a written reprimand to Flynn

---

1. In reporting their concerns to Dr. Marco and other officials, the petitioners asserted that they were acting in conformity with the school system's "Sexual Harassment" policy which encourages students to report questionable conduct to the principal. *See* Regulation "Sexual Harassment," § III.B.3.a. ("Any ... student who believes that she or he has been subjected to sexual harassment should report such conduct promptly"); Regulation "Parent Involvement," § III.A. ("Parent involvement can be defined as efforts which enable parents and families to participate as partners in the educational process at home or in school. Parent involvement efforts should be aimed at developing a climate of open communication, trust, and mutual respect among all members of the school community").

for actions that showed different and unequal treatment of girls on the Walt Whitman High School cross-country track team. The Superintendent also denied Flynn the opportunity to coach any Montgomery County public school athletic teams for one year beginning July 1, 1998, barred Flynn from being a teacher at Walt Whitman High School, and required Flynn to participate in a gender anti-discrimination education course. Walt Whitman High School also replaced Flynn with two cross-country track coaches, one for the boys' team and one for the girls' team.

Flynn did not attempt to appeal any of the Superintendent's actions to the Montgomery County Board of Education or to the Maryland State Board of Education pursuant to Maryland Code (1978, 2001 Repl.Vol., 2002 Supp.), § 4–205(c) of the Education Article, or pursuant to regulations of the Montgomery County Board of Education. Flynn did file a grievance against the Montgomery County public school system pursuant to the collective bargaining agreement between the school system and the union representing teachers. An American Arbitration Association hearing was commenced but never completed because Flynn withdrew his grievance.

In January 1999, Flynn filed, in the Circuit Court for Montgomery County, this defamation action against the two students, Joanna Zuercher and Claire White–Crane, and their parents, Glenn Reichardt, JoAnn Zuercher, Donald Crane and Diana White–Crane. In his complaint, Flynn alleged that the students and their parents defamed him by fabricating and communicating to Dr. Marco and other public school officials false and malicious allegations of sexual abuse, sexual harassment, and sex discrimination by Flynn against female athletes on the Walt Whitman cross-country track team. Flynn asserted that the girls made these false statements in order to have Flynn removed as their coach and to obtain a separate coach for the female runners on the cross-country team. Flynn alleged that these defamatory statements led to his transfer from Walt Whitman High School and to the loss of his coaching position. In a second count, Flynn alleged tor-

tious interference with the economic relationship between Flynn and the public school system.

In response, the petitioners moved to dismiss the complaint. The Circuit Court for Montgomery County granted the Motion to Dismiss, with prejudice, on the ground that the petitioners' communications with the public school system officials about Flynn's alleged misconduct were protected by an absolute privilege. Flynn took an appeal, challenging only the dismissal of the defamation action. He did not, on appeal, contest the dismissal of the count charging tortious interference with economic relationship.

The Court of Special Appeals reversed, holding that the statements in question were not absolutely privileged. *Flynn v. Reichardt,* 131 Md.App. 386, 749 A.2d 197 (2000). The Court of Special Appeals initially acknowledged that this Court had adopted "the common law rule of absolute privilege in which a person is protected from liability for defamation for testimony given as a witness in a judicial proceeding," and the intermediate appellate court pointed to "Maryland's broad view of the privilege, which includes administrative and other quasi-judicial proceedings." *Flynn v. Reichardt, supra,* 131 Md.App. at 392, 749 A.2d at 201. The Court of Special Appeals stated that, under *Gersh v. Ambrose,* 291 Md. 188, 197, 434 A.2d 547, 552 (1981), the applicability of the absolute privilege in administrative proceedings depended in part upon the "adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." The Court of Special Appeals then held that adequate procedural safeguards were not present in this case because, in the appellate court's view, Flynn was not entitled to a hearing and he was not entitled to any administrative appeal from the Superintendent's adverse actions. *Flynn,* 131 Md.App. at 397–402, 749 A.2d at 203–206.[2]

---

**2.** Flynn had not argued in his Court of Special Appeals' briefs that he had no right to appeal the Superintendent's action or that he had no right to a hearing on appeal. Instead, he had argued that the administrative appellate proceedings were insufficient to protect him from the

The students and their parents filed in this Court a petition for a writ of certiorari which we granted, *Reichardt v. Flynn*, 359 Md. 668, 755 A.2d 1139 (2000). Flynn did not file a cross-petition for a writ of certiorari.

The petitioners argue that, under this Court's decisions, the Circuit Court correctly held that absolute privilege barred the action. The petitioners further argue that the Court of Special Appeals erred in holding that Flynn had no right to appeal the Superintendent's actions. Flynn defends the Court of Special Appeals' holding that he had no right to appeal the Superintendent's action. He further argues that petitioners should be entitled only to a qualified privilege. Neither side has raised any state or federal constitutional issues in this case, and neither side has argued that any of this Court's decisions should be overruled.

II.

A.

More than 100 years ago, this Court in *Hunckel v. Voneiff*, 69 Md. 179, 14 A. 500 (1888), after reviewing Maryland's history regarding the matter, numerous English cases, and cases in other states, held that an absolute privilege applies to the statements of a witness in a judicial proceeding and that no libel or slander action based upon such statements can be maintained. Judge Miller for the Court explained (69 Md. at 193, 14 A. at 504):

"A different view as to the extent of the privilege has been taken by the courts of many of the States, and it may be conceded that the weight of authority in this country is in favor of a much greater restriction upon the privilege than is sanctioned by the English decisions. But we are not controlled by any decision of our own courts, and are at liberty to settle the law for this State according to our best

harm caused by the alleged defamatory statements. (Appellant's brief in the Court of Special Appeals at 14–16; appellant's reply brief in the Court of Special Appeals at 14–15).

judgment. After a most careful consideration of the subject, we are convinced that the *privilege of a witness* should be as absolute as it has been decided to be by the English authorities we have cited, and we accordingly adopt the law on this subject as they have laid it down."

*See also Bartlett v. Christhilf,* 69 Md. 219, 223–227, 14 A. 518, 519–520 (1888).

The absolute privilege for statements made in judicial proceedings has been reaffirmed by this Court on numerous occasions. In *Schaub v. O'Ferrall,* 116 Md. 131, 81 A. 789 (1911), for example, the plaintiff brought a defamation action against a witness and her lawyer in a prior divorce action, alleging that the defendants in the divorce action maliciously conspired to present perjured testimony which injured the plaintiff. In holding that a demurrer to the declaration was properly sustained on the ground of absolute privilege, Judge Pattison for the Court, 116 Md. at 138, 81 A. at 792, quoting *Dawkins v. Rokeby,* [1873] L.R. 8 Q.B. 255, explained:

"But the principle we apprehend is, that public policy requires that witnesses should give their testimony free from any fear of being harassed by an action on an allegation, whether true or false, that they acted from malice."

The *Schaub* opinion went on to hold that the privilege is not " 'affected by the relevancy or irrelevancy of what [the witness] says,' " and that the privilege is not defeated by alleging that the defamation was " 'done by and through a conspiracy of several.' " 116 Md. at 138–139, 81 A. at 792.

This Court, in an opinion by Judge Cole, again reviewed the issue in *Korb v. Kowaleviocz,* 285 Md. 699, 704, 402 A.2d 897, 899 (1979), stating: "We shall, however, apply the rule of *Hunckel* and *Schaub,* that in Maryland the testimony of a witness in a judicial proceeding is unconditionally privileged."

In *Adams v. Peck,* 288 Md. 1, 4, 415 A.2d 292, 294 (1980), with regard to an allegedly defamatory physician's report to an attorney, this Court held that

"an absolute privilege applies to a defamatory statement published in a document which is prepared for possible use

in connection with a pending judicial proceeding but which has not been filed in that proceeding."

Judge Davidson for the Court in *Adams* reviewed the scope of the privilege as follows (288 Md. at 3–4, 415 A.2d at 293):

"In Maryland, judges, attorneys, parties and witnesses are absolutely privileged to publish defamatory matters during the course of a judicial proceeding. *Korb v. Kowale-viocz*, 285 Md. 699, 701–04, 402 A.2d 897, 898–99 (1979); *Hunckel v. Voneiff*, 69 Md. 179, 193, 14 A. 500, 504 (1888); *Maulsby v. Reifsnider*, 69 Md. 143, 162–64, 14 A. 505, 510–11 (1888). *See Kennedy v. Cannon*, 229 Md. 92, 97, 182 A.2d 54, 57 (1962) (dicta). *See generally* Prosser, *Law of Torts*, § 114 (1971). This absolute privilege protects the person publishing the defamatory statement from liability even if his purpose or motive was malicious, he knew that the statement was false, or his conduct was otherwise unreasonable. *Maulsby*, 69 Md. at 164, 14 A. at 511. *See Kennedy*, 229 Md. at 97, 182 A.2d at 57. It extends not only to defamatory statements made in the courtroom during the course of the trial, *Korb*, 285 Md. at 704, 402 A.2d at 899; *Maulsby*, 69 Md. at 164, 14 A. at 511, but also to such statements published in documents which have been filed in a judicial proceeding. *DiBlasio v. Kolodner*, 233 Md. 512, 520–23, 197 A.2d 245, 250–51 (1964) (declaration in prior suit); *Bartlett v. Christhilf*, 69 Md. 219, 227, 14 A. 518, 520 (1888) (petition); *Kerpelman v. Bricker*, 23 Md.App. 628, 634, 329 A.2d 423, 427 (1974) (letter of complaint to then Grievance Committee of Maryland State Bar Association initiating a 'judicial proceeding'). *See Kennedy*, 229 Md. at 97, 182 A.2d at 57." (Footnote omitted).

The Court in *Adams*, 288 Md. at 7–8, 415 A.2d at 295, explained why the privilege was applicable to documents prepared for use in judicial proceedings:

"We agree with the expressed underlying rationale for according an absolute privilege, not only to defamatory statements made in court and in documents which have been filed, but also to such statements published in documents which are prepared for use in connection with a

pending judicial proceeding but which have not been filed. The evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth and therefore of the judicial process as is the presentation of such facts and opinions during the course of the trial, either in filed documents or in the courtroom itself. Such evaluation and investigation, and the documents which these activities generate, are directly related to the pending litigation and occur during the course of the judicial proceeding. The people who engage in these activities and who generate such documents must be able to do so without being hampered by the fear of private suits for defamation. Accordingly, any defamatory statement which appears in a document prepared for possible use in connection with a pending judicial proceeding should be accorded an absolute privilege, regardless of whether the document has been filed."

*See also Keys v. Chrysler Credit Corp.*, 303 Md. 397, 403–404, 494 A.2d 200, 203 (1985) ("At least since 1888 ... we have recognized the existence of an absolute privilege for defamatory statements uttered in the course of a trial or contained in pleadings, affidavits or other documents directly related to the case. The privilege operates in favor of the judge as well as the witnesses, counsel, and parties to the litigation. Our interpretation of the privilege has consistently been broad and comprehensive in recognition of the sound policy announced in [the cases]").

In *Gersh v. Ambrose, supra,* 291 Md. 188, 434 A.2d 547, this Court for the first time addressed the issue of whether the absolute privilege should apply to administrative proceedings. The Court, in an opinion by Judge Cole, again relying upon British authority, held that the privilege should apply to some administrative proceedings.[3] We stated, 291 Md. at 197, 434

---

3. The British decision, *Trapp v. Mackie,* [1979] 1 All E.R. 489, [1979] 1 W.L.R. 377 (H.L.1978), was a defamation action by a Scottish school headmaster who had been dismissed by the local education authority,

A.2d at 551–552, that the application of the absolute privilege in administrative proceedings

"will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements."

We held that the privilege did not apply to the administrative proceeding in the *Gersh* case, as the proceeding was substantially "an ordinary open public meeting." 291 Md. at 196, 434 A.2d at 551. The proceeding did not resemble an adjudicatory administrative proceeding or a contested case administrative proceeding under the Maryland Administrative Procedure Act. *See* Code (1984, 1999 Repl.Vol.), §§ 10–201 through 10–226 of the State Government Article.

Four years after *Gersh v. Ambrose*, this Court relied upon that case to hold that the absolute privilege applied to a citizen's complaint against a deputy sheriff, made to the Harford County Sheriff's Office, under circumstances which are quite analogous to the circumstances in the case at bar. In *Miner v. Novotny*, 304 Md. 164, 498 A.2d 269 (1985), we pointed out that the brutality complaint against the police officer would be investigated by the law enforcement agency under the Law–Enforcement Officers Bill of Rights (the "LEOBR"), then codified as Code (1957, 1982 Repl.Vol.), Art. 27, §§ 727–734D, that if the investigation disclosed that there was substance to the complaint, the police officer would be entitled to an adjudicatory hearing before a department hearing board, that if the hearing board determined that the officer was innocent, the matter would terminate, and that if the board found that disciplinary action was appropriate, it would make a recommendation to the head of the police department. Chief Judge Murphy for a unanimous Court in *Miner v. Novotny, supra,* 304 Md. at 176, 498 A.2d at 274–275,

---

and who appealed to the Secretary of State for Scotland. The alleged defamatory statements were made in proceedings before the Secretary of State. The House of Lords held that the absolute privilege should extend to this administrative proceeding.

explained why the absolute privilege should apply to the citizen's complaint:

"Our society vests its law-enforcement officers with formidable power, the abuse of which is often extremely detrimental to the public interest. Citizen complaints of such abuses, and the administrative disciplinary procedure which has been developed to investigate these complaints, serve a public function of vital importance by providing a mechanism through which abuses may be reported to the proper authorities, and the abusers held accountable.

"The viability of a democratic government requires that the channels of communication between citizens and their public officials remain open and unimpeded. Were complaints such as Novotny's not absolutely privileged, the possibility of incurring the costs and inconvenience associated with defending a defamation suit might well deter a citizen with a legitimate grievance from filing a complaint. We therefore conclude that the possible harm a false brutality complaint may cause to a law-enforcement officer's reputation, despite the procedural safeguards provided by the LEOBR, is outweighed by the public's interest in encouraging the filing and investigation of valid complaints."

If "public school teacher" were substituted for "law-enforcement officer," the above-quoted passage would be fully applicable in the case at bar.

The Court in *Odyniec v. Schneider*, 322 Md. 520, 588 A.2d 786 (1991), reaffirmed the opinions in *Gersh* and *Miner*, as well as in *Adams v. Peck, supra*, holding that an examining physician's statement to a claimant, in connection with a health claims arbitration proceeding, was absolutely privileged. Chief Judge Murphy, again for a unanimous Court, explained the policy underlying this application of absolute privilege (*Odyniec v. Schneider, supra*, 322 Md. at 534–535, 588 A.2d at 793):

"That Dr. Schneider's defamatory statement may have been gratuitous, unsolicited, and in part irrelevant to the purpose for which he was employed, and was not made

during the actual hearing before the arbitration panel, does not defeat the absolute privilege. Whatever Dr. Schneider's motivation may have been, he made his verbal statement to Ms. Ensor, a party in the then-pending arbitration proceeding, while he was conducting a medical examination of her in preparation for his participation in that proceeding. It was thus made in the course of his participation in that pending proceeding and therefore, without regard to its relevance, the verbal statement is accorded the same absolute privilege as if it had been made by a witness during the arbitration hearing itself.

"The social benefit derived from free and candid participation by potential witnesses in the arbitration process is essential to achieve the goal of a fair and just resolution of claims of malpractice against health care providers. At the same time, we are mindful of the damage that may be done to a health practitioner's reputation by a defamatory statement. But balancing the potential harm caused by such statement made during the pendency of the arbitration process against the societal value of maintaining the integrity of the process itself, we accord greater weight to the latter. The strong public policy considerations which led us to accord an absolute privilege in *Adams* and *Miner* are equally present in the circumstances of the present case."

*See also Imperial v. Drapeau,* 351 Md. 38, 716 A.2d 244 (1998) (reaffirming the decisions in *Odyniec* and *Miner,* and holding that the absolute privilege applied to allegedly defamatory letters, complaining about a rescue squad emergency medical technician, which were sent to a congresswoman and a governor, who forwarded the letters to the appropriate local government officials).

### B.

The Court of Special Appeals in the present case acknowledged that the "first prong" of the *Gersh v. Ambrose* "test" was met, saying (*Flynn v. Reichardt, supra,* 131 Md.App. at 394, 749 A.2d at 202):

"In this case, the first prong of the *Gersh* test is clearly met. As the lower court observed, '[T]here is really nothing more important to the core of the well-being of our community, our State and our nation than the public school system.' It is unquestionably an issue of strong public interest that students and parents should be protected from suit for reporting a teacher's alleged sexual misconduct."

The Court of Special Appeals also indicated, in one part of its opinion, that if Flynn had been entitled to appeal the Superintendent's action, the "second prong" of *Gersh v. Ambrose* would have been met, as "adequate procedural safeguards are available at the appellate level." *Ibid.* As previously mentioned, however, the intermediate appellate court held "that Flynn did *not* have the opportunity to appeal or request a hearing." 131 Md.App. at 397, 749 A.2d at 203. We disagree.

Section 4–205(c) of the Education Article of the Maryland Code provides as follows:

"(c) *Interpretation of law; controversies and disputes.*—

(1) Subject to the authority of the State Board under § 2–205(e) of this article, each county superintendent shall explain the true intent and meaning of:

(i) The school law; and

(ii) The applicable bylaws of the State Board.

(2) Subject to the provisions of § 6–203 and Subtitle 4 of Title 6 of this article and without charge to the parties concerned, each county superintendent shall decide all controversies and disputes that involve:

(i) The rules and regulations of the county board; and

(ii) The proper administration of the county public school system.

(3) A decision of a county superintendent may be appealed to the county board if taken in writing within 30 days after the decision of the county superintendent. The decision may be further appealed to the State Board if taken in writing within 30 days after the decision of the county board."

In this case, after quoting § 4–205(c), the Court of Special Appeals stated (131 Md.App. at 401, 749 A.2d at 206):

"Contrary to appellees' assertion, § 4–205(c) does not provide a right to appeal *any* decision by a county superintendent, but rather, only those decisions that explain the true intent and meaning of the school law and the applicable bylaws of the State Board, as well as decisions involving the rules and regulations of the county board and the proper administration of the county public school system. A superintendent's decision to suspend a teacher during the investigation of a complaint and subsequent decision to reprimand is not provided an appeal pursuant to this section of the Maryland Code."

The appellate court did not go on to explain why a superintendent's decision to reprimand a teacher or transfer a teacher to another school because of misconduct is not a decision in a "dispute" involving the "proper administration of the county public school system."

Under the plain language of the statute, as well as this Court's opinions, the dispute in this case did involve the proper administration of the school system. Moreover, in light of the regulations concerning nondiscrimination, gender equity, and sexual harassment, previously referred to in this opinion, *supra* n. 1, the dispute also involved the "rules and regulations of the county board." Section 4–205(c) broadly covers county superintendents' decisions on "*all* controversies and disputes" involving rules and regulations of the county school board, the school law and bylaws of the State Board of Education, and the "proper administration of the county public school system" (emphasis added). It is difficult to imagine any disciplinary action against a teacher or coach, taken by a county superintendent, that would fall outside of the broad scope of the statute.

In *Board of Education, Garrett Co. v. Lendo,* 295 Md. 55, 453 A.2d 1185 (1982), a public school teacher who also coached was given an "evaluation" that he "needs improvement" on one item relating to coaching after school hours. The evaluation

was made by the teacher's principal and later upheld by the local school superintendent. This Court, in holding that the teacher and coach had a right to appeal under § 4–205(c) and that the State Board of Education was required to entertain the appeal under § 4–205(c), traced the history of the statute since its initial enactment in 1916. In an opinion by Judge Marvin Smith, we rejected the State Board of Education's recent restrictive interpretation that § 4–205(c) required the State Board to hear only those appeals which involved the state " 'Education Article or a State Board bylaw,' " 295 Md. at 59, 453 A.2d at 1187. The Court pointed out that the statutory "language is plain and unambiguous," 295 Md. at 63, 453 A.2d at 1189. We stated that the "argument that this [broad interpretation] will place a tremendous workload on the State Board of Education, that the number of appeals will create fiscal problems, and that the county superintendents collectively make hundreds of decisions each day do not override the plain meaning of the statute which it is our duty to interpret. The workload of the State Board and the fiscal implications are problems for the General Assembly." 295 Md. at 64–65, 453 A.2d at 1190.

For additional cases emphasizing the broad authority of local school boards and the State Board of Education over appeals under § 4–205(c), or under other appellate review provisions in the Education Article, *see, e.g., Montgomery County Education Ass'n v. Board of Education,* 311 Md. 303, 308–311, 534 A.2d 980, 982–984 (1987); *Board of Education for Dorchester County v. Hubbard,* 305 Md. 774, 786–792, 506 A.2d 625, 631–634 (1986); *Board of Education of Prince George's County v. Waeldner,* 298 Md. 354, 470 A.2d 332 (1984) (an appeal under § 6–202 of the Education Article where a teacher or other professional was dismissed or suspended); *Resetar v. State Board of Education,* 284 Md. 537, 399 A.2d 225, *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979); *Strother v. Howard County Board of Education,* 96 Md.App. 99, 623 A.2d 717 (1993).

Under the broad language of § 4–205(c) of the Education Article, and the judicial decisions applying that statute, Flynn

was entitled to appeal to the Montgomery County Board of Education and, if there unsuccessful, entitled to appeal to the State Board of Education. The regulations of the Montgomery County public school system grant a right to a hearing with respect to appeals under § 4–205(c) of the Education Article. *See* the Montgomery County Board of Education's Policy BLB, entitled "Rules of Procedure in Appeals and Hearings." Flynn had a right to a second appeal to the State Board of Education, a right to a hearing, and a right to judicial review of the State Board's final administrative decision. The proceedings before the State Board and the judicial review proceedings are governed by the State Administrative Procedure Act, §§ 10–201 through 10–226 of the State Government Article. *See, e.g.*, § 10–203 of the State Government Article delineating the scope of the "Contested Cases" subtitle of the Administrative Procedure Act; *Board of Education of Prince George's County v. Waeldner, supra,* 298 Md. at 363, 470 A.2d at 336; *Hunter v. Board of Education, Montgomery County,* 292 Md. 481, 489, 439 A.2d 582, 586 (1982); *Resetar v. State Board of Education, supra,* 284 Md. at 553–554, 399 A.2d at 233–234; *Strother v. Howard County Board of Education, supra,* 96 Md.App. at 107–110, 623 A.2d at 721–722.

The Court of Special Appeals also indicated that, even if Flynn had been entitled to appeal and obtain hearings before the County Board and the State Board, there would still be inadequate procedural safeguards because the alleged defamation had already occurred in the petitioners' initial complaint. The intermediate appellate court stated (131 Md.App. at 397, 749 A.2d at 203): "Procedural safeguards that are available only on appeal *after* adverse action has already been taken fail to minimize the occurrence of defamatory statements, as required by *Gersh.*" This same situation, however, is going to exist in every case in which a complaint is made about government personnel, and the complaint initiates an administrative proceeding. The Court of Special Appeals' criticism would be equally applicable to the facts of *Miner v. Novotny, supra,* 304 Md. 164, 498 A.2d 269, or *Imperial v. Drapeau, supra,* 351 Md. 38, 716 A.2d 244. In both of those cases, the

alleged defamation was contained in the initial complaint against the government employee, and the opportunity for a hearing to rebut the defamation came later. In fact, in probably the majority of cases in which this Court has held that an absolute privilege was applicable, the alleged defamation occurred before a hearing or trial could take place at which the defamatory statement could be rebutted. In addition to *Miner* and *Imperial, see, e.g., Odyniec v. Schneider, supra,* 322 Md. 520, 588 A.2d 786 (physician's defamatory statement was made at an examination prior to the health claims arbitration hearing); *Keys v. Chrysler Credit Corp., supra,* 303 Md. 397, 494 A.2d 200 (defamation contained in a writ of garnishment); *Adams v. Peck, supra,* 288 Md. 1, 415 A.2d 292 (defamatory statement was made in a pre-trial report to an attorney).

The administrative proceedings and appeals that were available to Flynn were much more extensive than most administrative proceedings in a non-public education matter. He was entitled to hearings, two levels of administrative appeals, and judicial review.[1] In principle, this case is indistinguishable from *Miner v. Novotny, supra,* 304 Md. 164, 498 A.2d 269. The Circuit Court correctly held that Flynn's defamation action was barred by absolute privilege.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. RESPONDENT TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.*

CATHELL, J., dissents.

---

4. Although not raised by either side, the Circuit Court's judgment in this case might well be sustainable on the alternative ground that Flynn failed to exhaust his administrative remedies. *See McCullough v. Wittner,* 314 Md. 602, 552 A.2d 881 (1989).

CATHELL, J., dissenting:

I respectfully dissent from the reasoning and the result reached by the majority. The majority has, once again, extended a creature that this Court created, but did not apply, in *Gersh v. Ambrose*, 291 Md. 188, 434 A.2d 547 (1981): administrative proceeding absolute immunity.[1]

I initially acknowledge that there are cases in which I did not dissent, where we have recognized absolute immunity for witnesses or complainants in an administrative agency proceeding. The most recent such opinion in which I joined was *Imperial v. Drapeau*, 351 Md. 38, 716 A.2d 244 (1998). There may have been others.

I have concluded that I was wrong and that this Court lacks the power to modify the common law to create new absolute privileges (absolute immunity) for parties, complainants or witnesses in administrative proceedings. In my view, the exercise of that power violates a unique provision of the Maryland Declaration of Rights (*see infra*) not mentioned in any of the Maryland cases since the 1901 case of *Coffin v. Brown*, 94 Md. 190, 50 A. 567 (1901), a case which we have

---

1. While most of the cases refer to the concept as an absolute or a qualified privilege, it is really a type of immunity from suit, as distinguished from actual privileges. For example, Maryland Code (1973, 1998 Repl.Vol., 2001 Supp.) *Subtitle 1. Competence, Compellability, and Privilege* of Title 9, *Witnesses*, of the Courts and Judicial Proceedings Article provides for privileges for certain persons, against those persons being compelled to testify, or compelled to permit testimony, as to certain topics. That subtitle provides that spouses cannot be compelled to testify about confidential communications that occur during a marriage; that a spouse cannot be compelled to testify in a criminal case against the other spouse; that a person may not be compelled to testify in violation of the attorney-client privilege; that the disclosure of communications between patients and psychiatrists and psychologist cannot be compelled, and there are many other privileges contained in the subtitle and perhaps in other statutory provisions and the common law.

That type of privilege is a right that a person has to keep matters, normally communications, confidential. The absolute and qualified or conditional privileges at issue in the case *sub judice* is the granting of a right not to be sued for communications the relator has already disclosed, *i.e.*, published. It is, in essence, a form of immunity rather than a privilege against disclosure.

never overruled. No similar provision is found in the federal constitution. No such constitutional limitations are mentioned in the *Gersh* discussion of the foreign state cases there examined, as being contained in any of the constitutions of those foreign states.

I would also dissent in this specific case, even if the Maryland constitutional provision did not exist. The standards that we discussed in *Gersh,* and later applied (unconstitutionally in my current view) in *Imperial,* in *Odyniec v. Schneider,* 322 Md. 520, 588 A.2d 786 (1991), and in *Miner v. Novotny* 304 Md. 164, 498 A.2d 269 (1985), in respect to administrative proceedings being the functional equivalent of judicial proceedings, simply do not exist in the case at bar. To apply absolute privilege, principles to the case at bar is to open Pandora's Box.[2] If an absolute privilege exists here, it will exist for all administrative proceedings no matter how far from, or attenuated they are from, the type of proceedings contemplated in *Gersh.*[3]

---

**2.** According to Greek Mythology, Pandora was:

"the first woman, created by Hephaestus, endowed by the gods with all the graces and treacherously presented to Epimetheus along with a box in which Prometheus had confined all the evils that could trouble mankind. As the gods had anticipated, Pandora opened the box, allowing the evils to escape, thereby frustrating the efforts of Prometheus. In some versions, the box contained blessings, all of which escaped but hope."

*The Random House Dictionary of the English Language* 1042 (Jess Stein ed., unabridged ed., Random House 1983). The term "Opening Pandora's Box" has come to be known as releasing "a source of extensive but unforeseen troubles or problems." *Id.*

**3.** The Legislature has afforded only qualified immunity in cases involving reports of child abuse or neglect under the provisions of Md.Code (1984, 1999 Repl.Vol., 2002 Cum.Supp.) § 5–708 of the Family Law Article and Md.Code (1973, 1998 Repl.Vol., 2001 Cum.Supp.) § 5–620 of the Courts and Judicial Proceedings Article. The provisions of § 5–620 stating "Any person who in good faith . . .", *i.e.,* creates a qualified immunity. The majority in the present case, in extending its absolute immunity holdings in administrative agency cases, extends the concept beyond the immunities created by the Legislature in very similar circumstances. Now, if sexual abuse of a child is reported directly to a police officer or child welfare agency, the reporter has a qualified immunity, but, if it is reported first to a school official, and then

Before addressing the constitutional issue, I will address some of the other cases involving the creation of privileges establishing absolute and qualified immunity from defamation suits.

We long ago established the basic rule for determining the extent of privilege in a defamation context. Although there have been recent cases, including *Imperial, Odyniec,* and *Miner,* in which we have applied a much broader interpretation (though I now doubt the constitutional validity of those cases), we have never overruled the basic holding of *Maurice v. Worden,* 54 Md. 233, 253–55 (1880), where we stated:

"There are two classes of privileged communications which form exceptions to the general law of libel. The one is absolutely privileged and cannot be sued upon, while the other may be the cause of action, and the suit upon it maintained on proof of actual malice [qualified privilege/immunity]. These privileges rest alone on the ground of public policy, and in speaking of them we have no reference to privileges which are secured by constitutional or statutory provisions.

"... Those enumerated by the author as being absolutely privileged, though false and malicious, and made without reasonable or probable cause, 'are communications made in the course of judicial proceedings, whether civil or criminal, and whether by a suitor, prosecutor, witness, counsel or juror; or by a judge, magistrate, or person presiding in a judicial capacity, of any court or other tribunal, judicial or military, recognized by and constituted according to law; and so also communications made in the course of parliamentary proceedings, whether by a member of either House of Parliament or by petition of individuals who are not members, presented to either house or to a committee thereof.' Beyond this enumeration we are not prepared to go. The doctrine of absolute privilege is so inconsistent

---

indirectly to a police officer by that school official, the reporter has an absolute immunity. For many reasons, the distinction simply does not, in my view, make sense.

with the rule that a remedy should exist for every wrong, that we are not disposed to extend it beyond the strict line established by a concurrence of decisions.

. . .

"We cannot, in view of the authorities or upon principle, hold the communication declared upon to be absolutely privileged. It was made in the line of duty, and this only clothes it with a privilege that is qualified. The occasion operates as a defense, unless express malice be proved. " '. . . The other class of privileged communications, for which there is no absolute privilege, is very numerous. In order to make the writer or publisher liable, it must appear that he acted maliciously and without probable cause. If there were no probable cause for the communication, the law implies that it was made with malice. If, however, it appear that there was probable cause, the communication is privileged, no matter how much actual malice dictated it.' . . . In *White v. Nicholls,* 3 How. 266, 11 L.Ed. 591, where the question of privilege was presented, the Supreme Court refused to extend the doctrine of absolute privilege to cases where the author of the alleged slander acted in the *bona fide* discharge of a public or private duty, legal or moral. . . . [T]he court [said] on page 287, 'But the term "exceptions," as applied to cases like those just enumerated, could never be interpreted to mean that there is a class of actions or transactions placed above the cognizance of the law, absolved from the commands of justice. It is difficult to conceive how, in society where rights and duties are relative and mutual, there can be tolerated those who are privileged to do injury *legibus soluti;* and still more difficult to imagine how such a privilege could be instituted or tolerated upon the principles of social good. . . .' " [Citations omitted.] [Alterations added.]

We noted in *Walker v. D'Alesandro,* 212 Md. 163, 172, 129 A.2d 148, 153 (1957), that "This Court long ago expressed opposition to the extension of the doctrine of absolute privilege (*Maurice v. Worden,* 54 Md. 233) to persons occupying offices

not previously recognized as falling within the protection of absolute privilege." In *Maurice,* we commented on a prior *nisi prius* case, *Dawkins v. Lord Paulet,* L.R. 5 Q.B. 94,[4] rejecting the majority opinion and adopting the dissenting opinion.

*Dawkins* involved an alleged libel contained in a communication from an Army officer to his superior made "in the course of military duty and as an act of military duty." *Maurice,* 54 Md. at 256. As in the case *sub judice,* it was argued that such a communication was absolutely privileged. Our predecessors disagreed with the majority opinion in *Dawkins,* saying

"But Chief Justice Cockburn [the dissenting Justice in the *Dawkins* case] thought differently, and was of opinion that an action would lie if the communications were made of actual malice and without reasonable and probable cause. We concur in the views taken in his opinion, and believing that they state the true rule of law, shall adopt them rather than the conclusions reached by the two judges who sat with him."

*Id.* at 256 (alteration added). We then held in *Maurice* that no absolute privilege existed, but, rather a qualified privilege, that threw "upon the plaintiff the *onus* of proving that [the defamatory statement] was not made from duty, but from actual malice and without reasonable and probable cause." *Id.* at 257 (alteration added).

I fail to see any greater duty, nor any greater public purpose in protecting the false statements of the girls and their parents in the case *sub judice,* than that of the duty of a military officer to communicate with others in the military. Surely, the need for candor and freedom of communication is even greater in the profession of arms (the profession of

---

4. *Maurice* does not identify the jurisdiction where *Dawkins* was decided. It would appear to be an English case. Others of the cases cited in *Maurice* are clearly English cases, although not always identified as such.

killing), than it is in the need to protect a group of teenagers that are involved in the present situation.

In *Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978), we held that statements made to an employer by an employee, that another employee had made improper advances to her, were conditionally privileged. We explained the foundation for the existence of a conditional privilege as:

> "The common law conditional privileges rest upon the notion that a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest."

*Id.* at 135, 387 A.2d at 1131. In *Marchesi,* we then "reformulated" a definition of malice, based in large part on some of our prior statements.

> "We hold, therefore, that 'knowledge of falsity or reckless disregard for truth' is the standard by which the malice required to defeat the conditional privilege defense is to be measured in cases of private defamation. To the extent that our prior decisions are not in accord with this holding, they are disapproved."

*Id.* at 139, 387 A.2d at 1133.

In *Hanrahan v. Kelly,* 269 Md. 21, 28–30, 305 A.2d 151, 156 (1973), we repeated the standard for establishing a conditional [qualified] privilege in a case involving business relationships, saying:

> " 'An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe [good faith] that facts exist which another sharing such common interest is entitled to know.' "

> . . .

> "Mutual interest in the subject matter is but one type of qualified privilege recognized in the law of defamation. The general rules governing all conditional privileges are, how-

ever, well-settled. A finding of conditional privilege conditionally negates the presumption of malice and shifts the burden to the plaintiff to show actual malice. Malice may be a jury question.... Absent a finding of express malice, a conditional privilege, if not abused, defeats the libel action." [Citations omitted.] [Alteration added.]

There are a number of cases where this Court has extended a qualified privilege to certain persons in respect to communications that were potentially defamatory. They include *Orrison v. Vance*, 262 Md. 285, 292, 277 A.2d 573, 576 (1971), where we extended a qualified privilege to a person who had reported a potentially dangerous, and possibly illegal, situation to appropriate authorities. There, we held that "we think the words spoken and written by Vance enjoyed, in these circumstances, a qualified privilege...." *Id.*

I agree that the qualified privilege extended to Vance in *Orrison* was appropriate. More important, it preserved Orrison's right to require that Vance be responsible for his words, and Vance's constitutionally imposed duty to be responsible for abuses, if any, in the exercise of his speech.

In the instant case, my difference with the majority is that it has extended the improper privilege, *i.e.*, an absolute privilege, instead of a qualified privilege.[5] Why, as a matter of policy, should parents and their children be absolutely immune when they are not acting in good faith?[6] Why should parents and their children be permitted to purposefully ruin the lives of others by maliciously communicating defamatory statements as is alleged here? I see no reason, based upon public policy concerns, or on anything else, to extend absolute immunity in such circumstances. The public policy concerns expressed by the majority could, in my view, be fully addressed by the extension of a qualified privilege under the circum-

---

5. It may well be that had the case been fully tried, the parents would have been found to have acted in good faith and would have been entitled to a qualified privilege.

6. Because of the posture of the case as it reaches us, we are required to assume that the appellees did not act in good faith.

stances here present. And, in the process, the constitutional duty imposed upon the exercise of speech in this state could be preserved.

In *Orrison,* the Court, in extending a qualified privilege, noted certain factors very similar to the factors the majority notes in the present case, but the majority in the case at bar goes even further than the Court did in *Orrison.* It extends an absolute privilege.

We noted in *Orrison* that the extension of the qualified privilege in respective cases, depended upon whether the communications were of the type and character, which would allow the claim of privilege to be made. We looked first at the relationships between Vance and the recipients of his communications, then the legal, moral or social duty impelling Vance to transmit the information, and whether he did so in good faith. In *Orrison,* 262 Md. at 293, 277 A.2d at 577, quoting the *Restatement of Torts* § 598:

> "An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that
>
> (a) facts exist which affect a sufficiently important public interest, and
>
> (b) the public requires the communication of the defamatory matter to a public officer or private citizen and that such person is authorized or privileged to act if the defamatory matter is true."

We commented then, that:

> "The question is not whether Orrison obeyed the law but whether Vance was justified in saying what he did say. . . . He was trying to eliminate what he thought was a very real danger and we are quite unwilling to say that he was not justified in thinking that the danger still existed. Moreover, the State's Attorney, the police, the commissioners and their attorney were certainly reasonable recipients of the communications and the citizens to whom he spoke shared his interest in obviating the danger. We think his efforts in this regard were conditionally privileged."

*Orrison,* 262 Md. at 293–94, 277 A.2d at 577 (citations omitted) (footnote omitted).

We discussed in *Stevenson v. Baltimore Baseball Club, Inc.,* 250 Md. 482, 486, 243 A.2d 533, 536 (1968), the common law origins of the concept of a qualified or conditional privilege, by quoting from the old English case of *Toogood v. Spyring,* 1 C.M. & R. 181, 193, 149, Eng. Rep. 1044 (1834):

" 'In general, an action lies for the malicious publication of statements which are false in fact, and injurious to the character of another (within the well-known limits as to verbal slander), and the law considers such publication as malicious, unless it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned. In such cases, the occasion prevents the inference of malice, which the law draws from unauthorized communications, and affords a qualified defence depending upon the absence of actual malice. If *fairly* warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society; and the law has not restricted the right to make them within any narrow limits.' "

I perceive that the public policy concerns of the majority would be adequately addressed by the adoption of a requirement that defamatory statements be privileged if they are fairly and honestly warranted by a reasonable perception of the circumstances and the exigency of the respective situation requires a qualified privilege. In such instances, a qualified privilege suffices.

In *Carr v. Watkins,* 227 Md. 578, 177 A.2d 841 (1962), we declined to extend an absolute privilege to a federal officer and two local law enforcement officers, noting that the communications at issue to a prospective employer of the plaintiff were not made within the scope of the defendants' offices. We did note several federal cases, in which the federal courts had extended absolute immunity for defamatory statements to

certain federal officials acting within the scope of functions of their offices. We discussed what had been, until recent times, this Court's reluctance to extend absolute privileges.

"Maryland has not adopted the rule laid down in the *Barr* case [7] but, on the contrary, this Court has shown reluctance to extend absolute privilege or immunity from liability for torts to government officers of a higher rank than these defendants."

*Id.* at 585, 177 A.2d at 844.

As I note, *infra,* the United States Constitution, unlike Maryland's Declaration of Rights, contains no provision in its free speech clause providing that a speaker must remain responsible for abuses in the exercise of speech. I would suggest that in purely state matters, *i.e.,* this, and similar cases, the federal cases extending absolute privileges beyond the traditional common law absolute privileges, are not appropriate authority to extend such privileges where a state constitution requires as a condition of speech, the assumption of responsibility for abuses of that speech.

One of the recent cases in which we extended an absolute privilege in respect to communications made in an administrative proceeding, under the guise of it being the functional equivalent of a judicial proceeding, was *Odyniec v. Schneider,* 322 Md. 520, 529, 588 A.2d 786, 790 (1991), cited by the majority, in which we initially noted what we had said ten years earlier in *Gersh v. Ambrose* 291 Md. at 197, 434 A.2d at 551–52:

"We decided that

'whether absolute witness immunity will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2)

---

**7.** In *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434, *reh'g denied,* 361 U.S. 855, 80 S.Ct. 41, 4 L.Ed.2d 93 (1959), the Supreme Court extended an absolute privilege to the acting director of the Office of Rent Stabilization.

the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements.'

"There being no evidence of the kind of safeguards which are present during judicial proceedings, and no evidence that the hearing was anything other than an open public hearing, we declined to extend absolute immunity to the witness in the *Gersh* case."

In *Odyniec*, we further discussed the making of defamatory statements during proceedings in respect to the Law Enforcement Officer's Bill of Rights, citing *Miner v. Novotny*, 304 Md. 164, 498 A.2d 269 (1985). We noted in *Odyniec* that in our holding in *Miner* (that the declarant had an absolute privilege, just as did witnesses in judicial proceedings) we had considered the following:

"In so concluding [in *Miner*], we examined the safeguards present during the investigation of the complaint, and at the adjudicatory hearing before the departmental hearing board, noting that they were adequate to minimize the occurrence of defamatory statements. We observed that under the statute, complaints of brutality are not investigated unless they are sworn, and that false complaints are subject to criminal liability; that prior to investigation, the officer has a right to be informed in writing of the nature of the investigation and of the officers involved in it; that the officer has a right to counsel during interrogation and to a record of the interrogation; that if an adversarial hearing is warranted after the investigation, it is held before at least three officers who were not involved in the investigation; that the officer has a right to counsel at the hearing; that the hearing board is authorized to issue summonses for witness[es] and documents; and witnesses at the hearing testify under oath and are subject to cross-examination."

*Id.* at 529–30, 588 A.2d at 790–91 (alterations added). In *Miner*, we considered the extensive procedural safeguards in place for the officer, before holding that there was an absolute privilege for statements made during those administrative proceedings. In *Miner*, however, as in all of our post-*Coffin v. Brown, infra,* cases, including *Odyniec* and *Imperial*, we

failed to even address the effects of the constitutional limitations of the Maryland Declaration of Rights.[8]

Instead, in *Odyniec*, we contrasted *Gersh* and *Miner*, with our case of *McDermott v. Hughley*, 317 Md. 12, 561 A.2d 1038 (1989), which involved whether a psychologist had an absolute privilege in respect to reports that the psychologist furnished to an employer at the employer's request. We commented in *Odyniec* that we had rejected the psychologist's argument, in *McDermott*, that he had an absolute privilege against being sued for defamation, in that the report was "made in connection with an on-going administrative proceeding." *Odyniec*, 322 Md. at 530, 588 A.2d at 791. After noting that the procedure in McDermott was not in the nature of an administrative proceeding in the first instance, we went on in *McDermott* to hold:

> "that there were insufficient procedural safeguards present; that 'there was no public hearing adversary in nature; no compellable witnesses were sworn or cross-examined; no reviewable opinion or analysis was generated; and ... [the employee had no] opportunity to present his side of the story.' "

*Odyniec*, 322 Md. at 531, 588 A.2d at 791.

*Odyniec* involved statements made by a doctor called as an expert, during a physical examination of a patient made outside of the administrative hearing itself, but during the course of, and as a part of, a Health Claims Arbitration proceeding. We noted that the statute provided that the Board was a unit of the executive branch of government; that it required the Board's Director to refer all issues of liability and damages to a three-member arbitration panel; that the panels were made up of a health care provider, a lawyer, and a member of the general public; that it was to be chaired by an attorney who would decide all prehearing issues; that he had

---

**8.** The opinions in *Odyniec, Imperial, Gersh,* and *Miner, supra,* including the dissenting opinion in *Imperial,* make no mention of the constitutional provision. It appears from the opinions that the constitutional provision I discuss, *infra,* has not been described in the cases since it was applied in *Coffin, supra,* a hundred years ago.

authority to decide discovery and evidentiary issues (thus discovery and some rules of evidence were contemplated). Additionally, the statute provided that physical examinations of claimants could be required by the Board. We noted that the controlling statute and rules were detailed and comprehensive. Each party had the right to object to, and to seek the removal of any arbitrators. Additionally, the claimant had to file a certificate with the Board at the inception of his claim. The certificate had to be executed by a qualified expert and was required to assert that the care given the claimant was a departure from the appropriate standard of care.

As to the proceeding itself, each party could be represented by counsel, the proceedings were public, and they were adversarial in nature. Witnesses could be subpoenaed. Witnesses were sworn and were subject to cross-examination. Panels could rule on matters of evidence, discovery was available, and each side's case could be presented orally or by documentation. The panel members, by statute, had absolute immunity, and were insulated from political influences. Finally, we noted that the panel's determinations had to be in writing.

After that process was concluded, the parties still had access to the courts, and the procedures and remedies there available. We held, therefore, in *Odyniec*, that because of the extensive procedures and safeguards available in Health Claim Arbitration proceedings, it operated in a manner that was "functionally comparable to a trial before a court...." *Odyniec*, 322 Md. at 534, 588 A.2d at 792. We held:

> "Taking full account of the vital public function of health care malpractice proceedings initiated before arbitration panels, and of the procedural safeguards provided by the statute and the implementing rules to minimize the occurrence of defamatory statements, we conclude that the absolute privilege may safely be extended to statements of potential witnesses made during the pendency of such proceedings."

*Id.* at 534, 588 A.2d at 792–93.

We noted in *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 589, 350 A.2d 688, 693–94 (1976), that the Supreme Court's decision

in *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), had modified (or explained) its prior holdings in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). We said in *Jacron,* 276 Md. at 589, 350 A.2d at 693:

> "The very essence of the *Gertz* decision, as we noted early on, was the shift in focus from the protection of free expression, which undergirded *New York Times* and its progeny, including *Rosenbloom,* to the state interest in protecting private persons who have been defamed. It was because the *Rosenbloom* approach did not afford sufficient recognition of this state interest that the *Gertz* Court found it unacceptable and sounded the death knell for the 'public or general interest' test as a [federal] constitutional requirement." [Citations omitted.] [Alteration added.]

Even without a consideration of Maryland constitutional requirements, I would, again, respectfully suggest, that the safeguards in place in the case at bar as pointed out and relied on by the Court of Special Appeals in its opinion, and in the majority opinion in this case, and in similar cases, are woefully inadequate, even under *Imperial, Odyniec* and *Miner* standards, to safeguard the teachers of this State from false, career damaging and career ending, accusations. What the majority does with its opinion, is to empower disgruntled students, of which one would think there are many, to remove teachers with whom they do not agree, and to do so with absolute immunity from meaningful consequences.

Under the majority's holding, while there are remedies relating to a teacher keeping his job, there are no remedies where the defamed teacher can redeem his or her reputation, nor any significant consequences for a student who fabricates a potentially hurtful claim against a teacher. If a student has a problem with a teacher, all she or he has to do is falsely accuse the teacher of some wrongful act. It ruins the teacher's career. And the student is not accountable to the teacher for his or her deceitful actions. The disturbing examples are seemingly endless.

If a teacher, Ms. Smith, is a tough grader in a required course, all a student needs to do is to falsely claim that she touched him or her in an inappropriate manner, and Ms. Smith will be removed from her teaching position. She will be gone, along with her tough grading reputation. Another teacher, Mr. Jones, sends a student to the principal's office for misbehavior. When the student arrives there he or she tells the principal that Mr. Jones is only trying to punish him or her because he or she has resisted his advances, complained about his sexist remarks, or he or she may accuse him of sexual, gender or racial discrimination. Instead of the student being suspended, Mr. Jones, just like Ms. Smith, will be terminated. These teachers not only lose their jobs, but their careers are destroyed. Even if the student later admits that he or she was lying, Mr. Jones' personnel records will always note that the complaint was made. A later finding of "unsubstantiated" merely means "not proven." Future prospective employers will always evaluate the existence of the charges in comparing Mr. Jones or Ms. Smith, with other applicants for the same positions. In these times of political correctness, the hiring administrators will take the safest course. They will not hire Ms. Smith or Mr. Jones.

Ms. Smith and Mr. Jones are forever tainted, as is Mr. Flynn in the case at bar. Why? In Mr. Flynn's case, merely because several girls wanted a separate cross-country coach. Mr. Flynn will forever be punished for acts he may not have committed. With its decision, the majority endorses what the children might have done. It does so in the name of public policy concerns based upon the importance of open avenues of communication for students and their parents. In the process, the majority is sending a message, that it is okay to be less than completely truthful. This is clearly not the type of activity that this Court should encourage and protect by a grant of absolute immunity.

Regardless of which standard is applied, with its decision the majority runs the risk of putting the children in charge of the schools. A logical extension of the holding will put patients in charge of mental health facilities, inmates in charge

of correctional institutions, and if its provisions were to be extended to animals, animals in charge of zoos. We should not facilitate such a potential transfer of control.

Moreover, the majority, in my view, does not sufficiently address another issue of policy and public concern—the impact of its decision, along with the cumulative impact of the numerous similar cases based upon false accusations by students, on the teaching profession as a whole.

According to the National Center for Education Statistics,[9] this country will need 2,200,000 new teachers for the public schools in this decade because of teacher attrition and retirement and the anticipated increase in enrollments. It is predicted that half of the teachers who will be in public school classrooms ten years from now have not yet been hired. By 2008, public school enrollments will exceed 54,000,000 students, an increase of 2,000,000 from 1998. Elementary school enrollments are expected to increase by 17% and high school enrollments by 26% over 1998 enrollments. The need for new teachers in high poverty urban and rural districts alone, in the decade will be more than 700,000 teachers.

The National Center for Education Statistics estimates that 6% of the nation's teaching force leaves the profession *every year* and 20% of new hires leave teaching within three years. The attrition rate for new teachers is especially acute in urban districts where 50% of new teachers leave the profession in the first five years of teaching.

According to *Education Week*, Vol. XIII, Number 40, August 3, 1994, more and more students are falsely accusing teachers of sexual abuse according to teacher's unions. The article quoted Karen L. Johnson, the general counsel of the Texas State Teachers Association, saying, "It's [false charges by students] more of a problem now than it has ever been in the past" (alteration added). Ms. Johnson indicated that in

---

9. Richard W. Riley, U.S. Secretary of Education, *A Back to School Special Report on the Baby Boom Echo: America's Schools Are Overcrowded and Wearing Out* (1998).

the sixteen years prior to 1994, the complaints against Texas teachers, alone, had risen from one or two a year to between thirty and fifty per year. Education Week reported that according to Ms. Johnson, the vast majority of complaints were unfounded.

The staff counsel for the Wisconsin Education Association Council reported that in 1977 such accusations against teachers constituted 5% of his workload. By 1994, it had risen to 25% of his work load. The article attributed to concerns expressed by Karl K. Pence, the President of the Maryland State Teachers Association, that the "climate of concern about abuse is much more charged now than it was just five years ago." The article quotes Mr. Pence as saying, "I will go back to the classroom far more wary than when I left."

The article included instances where false accusations had occurred.

"False charges sometimes arise as a way for a student to get revenge on a teacher for some perceived wrong.

"Last spring in Chicago, a substitute teacher was falsely accused by students in a 4th-grade class that had become unruly.

"The substitute said he disciplined the students and told them he would leave a note reporting their behavior to their regular teacher. The next day, the substitute teacher was accused of molesting 10 of the students."

According to Education Week, false accusations are particularly egregious in the teaching profession. "Allegations of abuse, whether true or false, can be devastating to educators, both personally and professionally." The Article continued, according to Ms. Kanthak the director of middle-level education at the National Association of Secondary School Principals: "They can never truly regain their position in the community, their sense of themselves, and how other people view them." The article noted that, according to Mr. Meredith, the Wisconsin Association lawyer, "students also learn that to get administrators' attention, 'certain words don't get

you anywhere in school, and certain words get you every-where.' "

According to Karl Pence, President of the Maryland State Teachers Association, as reported in *U.S.A. Today* on March 22, 2000:

> "A few years ago, we got one or two calls a week from a teacher saying a student was making false accusations against him. Now we get one or two a day.
>
> . . .
>
> "Beyond ruining teachers' reputations and calling the credibility of children into question, you have a more wide-spread impact.... Teachers are getting more and more afraid to interact with kids. You can't put a hand on a student's shoulder for fear it will be deemed inappropriate contact.
>
> . . .
>
> "It's terrible that it's coming to this.... But, it's scary to think you'll wind up in court. We're forced to distance ourselves from our students. It's gotten so that you can't pat a kid on the back anymore for a job well done."

According to remarks attributed by the May 18, 1994 Edition of the Washington Times to Keith Geezer, President of the 2.1 million member National Education Association:

> "It's all part of this idea of getting back at people. With the breaking of the family and everything that goes with it, kids have so much pent-up anger over their whole life that they vent their frustration on teachers.... Nothing excuses an accusation that is true. But many more are trumped up than are true."

The same article quoted Walter C. Levin, then chief counsel for the Maryland State Teachers Association, saying "when I got in this business thirty-seven years ago, we had one [complaint of child or sexual abuse involving a Maryland teacher] in a decade." Now, there are about a dozen accusations a week in Maryland.

The article attributed to Albert T. Shanker, president of the 800,000 member American Federation of Teachers, that the number of such accusations is costing the profession good teachers. It quotes Shanker as saying: "It contributes to people deciding not to come into teaching. Smart people see it's easy for a teacher to be set up."

Susan Russell, one of three staff lawyers with the Maryland State Teachers Association, is quoted in the article, saying:

"I get two calls a day from teachers accused of such abuse, and I'm only handling half the state. There's been a flood of cases and 99 percent of them have been frivolous and never should have been reported to Social Services.

"This is a tremendous expense to the state. Teachers pay for our representation through union dues, but everybody pays for police officers and other state investigators. We have a half-million-dollar legal budget and over 50 percent of our time is spent on this type of stuff."

I would respectfully suggest that the establishment of a conditional or qualified privilege standard would better address, what I perceive to be, both areas of public concern. The need for students to communicate with school administrators and the need to ensure that the profession of teaching remain attractive to potential teachers.

Finally, in addition to my belief that the creation of an absolute privilege is not warranted even under the *Gersh, Imperial, Odyniec* and *Miner* standards, nor that an absolute privilege properly balances the competing public policy concerns, I do not believe that this court can constitutionally fashion new non-traditional, common law absolute privileges in cases involving speech, *i.e.,* defamation. As I perceive the facts of the instant case, and in prior cases as well, by creating the absolute privilege, the Court terminates all remedies for the wrongs committed in a manner that conflicts with the Maryland Declaration of Rights.

## ARTICLE 40—DECLARATION OF RIGHTS

Article 40 of the Maryland Declaration of Rights, provides for freedom of press and of speech, but qualifies the right to

freedom of speech. It provides in relevant part: "that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, *being responsible for the abuse of that privilege.*" *Id.*(emphasis added). We have held in a prior defamation case that has never been overruled, that the right to speak is subject to the caveat in Article 40, that the speaker is responsible for abuse of the right.

Twenty-one years after we decided *Maurice,* in *Coffin v. Brown,* 94 Md. 190, 50 A. 567 (1901), we addressed the issue of absolute privilege, at least partially in a constitutional context, incorporating the meaning of Article 40 of the Maryland Declaration of Rights. In *Coffin,* the alleged defamatory communication was addressed to a public officer, the Chairman of the Democratic State Central Committee, and concerned the qualifications of Brown to be a supervisor of elections. The communication contained this language:

"This man Brown was a Justice of the Peace under Democratic rule, and at that time kept a speak-easy, where he sold whiskey, and then as Justice fined the men for disorderly conduct. He helped stuff the ballot-box at the Republican primaries in Vansville District two years ago, and has no moral character whatever.... A man that everyone who knows him believes can be induced to perpetrate any crime in politics that will pay him...."

*Id.* at 192, 50 A. at 567.

In reversing a lower court judgement for the libeler, this Court said:

"If every appointee of a President, Governor, or other officer seeking re-election, is to be liable to be subjected to false charges, imputing crimes or other acts that bring reproach upon him, and he is to be deprived of all redress on the theory that words so uttered or published are privileged, then indeed is his lot an unfortunate one.... Our Declaration of Rights declares 'that any citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, *being responsible for the abuse of that privilege.*' It is a gross abuse of that privilege to

falsely prefer such charges as are made against the appellee in this letter. . . ."

*Id.* at 197–98, 50 A. at 569–70 (emphasis in original). This constitutional provision recognizes, indeed, in my view reflects, the State's constitutional interest in affording a greater degree of protection to private persons who are defamed, than that afforded by the majority's decision and affords a greater degree of protection than that provided by the United States Constitution's guarantees of free speech.

The majority's opinion in this case, and perhaps in other recent cases as well, in my view, is in conflict with this Maryland constitutional provision. The majority, at least for the purposes of creating an absolute privilege flatly states, that the relators, the girls and their parents, are absolutely not responsible for the abuse because of the dictates of public policy concerns. I respectfully suggest that this Court lacks the power to create new common law absolute privileges. To do so in specific new classes of cases, abolishes, or tends to abolish, the Maryland constitutional responsibility require-ment by judicial fiat, under the guise of public policy con-cerns.[10]

It is quite a different situation to create a "qualified privi-lege" exception. In that circumstance, the injured party retains a remedy, the right and the ability to attempt to prove that the statement at issue was not made in good faith, was not reasonable, and lacked a probable cause basis, in the absence of which, the injured party might recover damages as recourse for the injury suffered. In such a manner, the

---

**10.** As I have indicated, I would also argue that the majority miscon-strues, or at least fails to balance, valid, contrary public policy concerns. (as well as the constitutional provision). The public journals and media are replete with references to the shortages of teachers and the quality of the instruction that results, at least partially, from that shortage. With its entire focus on the public concern that students should have the right to express themselves, without being responsible for abuses of that expression, the majority opens the floodgates of false accusations on members of the teaching profession. A qualified or conditional privilege might balance the competing public policy concerns. The creation of an absolute privilege cannot.

constitutional obligation that requires a speaker to be responsible for abuses is met. In a case that lacks good faith, reasonableness, and probable cause, the speaker is held responsible for his false and defamatory speech, and the constitution is satisfied. If, however, a plaintiff cannot show a lack of good faith, a lack of reasonableness and/or a lack of probable cause, a speaker's statements may be privileged.

By creating new absolute privileges whenever this Court perceives it to be proper, according to its conception of proper public policy concerns, the Court is, in essence, judicially repealing the constitutional requirement that a speaker be responsible for abusing the privileges of speech. While this Court might have had power normally, in the absence of the exercise of such power by the Legislature, to modify the common law foundation of the law of defamation, it (and the Legislature for that matter), lacks the power to modify the Declaration of Rights of the Constitution of Maryland, which is exactly what occurs when either entity provides that certain speakers are not responsible for abuses in their exercises of speech. With all due respect, it is my belief that in our constitutional form of government, this Court lacks the power to do what it has done in this case, and perhaps, in other recent cases as well (in at least one of which I, admittedly, joined).

The Maryland Constitution contains, as indicated, a provision requiring a speaker to be responsible for abuses of speech. We have recognized that requirement in declining to recognize absolute privileges. *Coffin, supra.*

We did at one time recognize the existence of an absolute privilege arising out of the United States Constitution (although later changing course). We attempted to base an absolute privilege on the federal constitution's petition clause, but our reliance on that provision was later negated. *McDonald v. Smith,* 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), forced us to abandon our reliance on federal case law and the position we had adopted in *Sherrard v. Hull,* 296 Md. 189, 460 A.2d 601 (1983), that a person who was petitioning the

government for redress of a grievance had an absolute privilege. As a result, in *Miner, supra* and *infra,* we overruled *Sherrard* and *Bass v. Rohr,* 57 Md.App. 609, 471 A.2d 752, *cert. dismissed,* 301 Md. 641, 484 A.2d 275 (1984), as to the existence of an absolute privilege based upon the speaker's right to petition.

> "In light of *McDonald,* the *qualified* privilege recognized in *New York Times* and its progeny constitutes the extent of the constitutionally-mandated protection of the First Amendment right to petition the government for redress of grievances. To the extent that they are inconsistent with *McDonald* and this opinion, *Sherrard* and *Bass* are no longer authoritative rulings."

*Miner,* 304 Md. at 170, 498 A.2d at 272 (emphasis added). Instead, we then based the creation of the absolute privilege we wanted to create in *Miner,* on the administrative proceeding absolute privilege we had formulated under our self-granted power to modify the common law (albeit, unrealized by us, as I perceive it, in an unconstitutional manner), but not applied in *Gersh.*

We adopted the opinion of the Court of Special Appeals in *Sherrard v. Hull,* 296 Md. 189, 460 A.2d 601 (1983). That court, in *Sherrard v. Hull* 53 Md.App. 553, 555, 456 A.2d 59, 61 (1983), had recognized an absolute privilege for persons addressing a legislative body, basing such a privilege on a person's federal constitutional right to petition such bodies to address their grievances and held "that remarks made by an individual in the course of petitioning for a redress of grievances before a legislative body are absolutely privileged under the First Amendment to the United States Constitution." The Court of Special Appeals noted that the First Amendment forbade Congress, and, through the Fourteenth Amendment the states, from passing any law "abridging" the right of the people to petition the government for a redress of grievances.

The Court of Special Appeals in *Sherrard* then discussed the split among the state and federal courts as to whether the "petitioning" privilege should be absolute or qualified. In

recognizing that most jurisdictions had recognized only a qualified privilege, the court ascribed to those cases the fact that they involved indirect petitioning (such as in the case at bar).

"Those cases which would hold the privilege to be qualified generally predate *Noerr–Pennington*[11] or are distinguishable in that they do not relate to the direct petitioning of a legislative body. In light of the evolution of the petitioning doctrine, we therefore find them to be unpersuasive. The modern, better reasoned cases hold that *true* petitioning activity should be absolutely privileged.

"There is a common thread which runs through the fabric of absolute defamation immunity as applied in Maryland. The judge and jury in the trial and the senator, delegate and councilperson in the legislative proceeding have a common need to receive as much information as is available in order to render a proper and informed decision."

*Id.* at 572, 456 A.2d at 69–70 (emphasis added). It is clear that, in any event, the absolute privilege extended to petitioning activities in *Sherrard* by the Court of Special Appeals, and then adopted by this Court, only to be later overruled, only extended to the petitioning of primary legislative entities, and not to other lessor governmental administrative agencies or their proceedings. With our overruling of *Sherrard*, in *Miner*, and in the cases since, including *Imperial, Odyniec, Miner*, and with the majority's holding in the present case, we appear to have created a bizarre situation in Maryland where one

---

**11.** The *Noerr*–Pennington doctrine, while it was applicable, provided that the right to petition protects the freedom to seek redress from all three coordinate branches of government. In its early formulation, it was held to apply both in federal and state court actions. It was derived from three cases. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). None of the cases was a defamation case. They were anti-trust-Sherman Act cases, although in *Pennington* the Supreme Court held that efforts to influence legislative or executive public officials were privileged.

directly petitioning legislative entities has only a qualified privilege, at least so far as the constitutionally guaranteed right to petition is concerned, but when one indirectly petitions a legislative or executive branch by complaining to a subordinate agency of the legislative or executive branches he gets an absolute privilege based upon our common-law creation in *Gersh* of an absolute administrative agency privilege. This is nonsensical.

I would affirm the Court of Special Appeals, but for all of the reasons stated in this dissent, especially on the basis that Article 40 of the Declaration of Rights forbids the judicial creation of new common law absolute immunity from responsibility for abuses of speech, *i.e.,* absolute immunity in defamation cases. I would either overrule the holdings of this Court in *Imperial, Odyniec,* and *Miner,* or, hold that they are no longer authoritative rulings, or, in the alternative, I would modify the holdings in those cases so that they would reflect the existence of qualified privilege/immunity rather than absolute privilege/immunity.

To continue on the path this Court has taken in recent years is, in my view, a totally unwarranted extension of the principles of immunity, and, more important, is an affront to the constitutional provision found in Article 40 of the Maryland Declaration of Rights.